*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0029P (6th Cir.)
File Name: 03a0029p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

DONALD G. WEXLER,

     *Plaintiff-Appellant,*

     *v.*

No. 99-3929

WHITE'S FINE FURNITURE, INC.,

     *Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 98-00379—James L. Graham, District Judge.

Argued: March 20, 2002

Decided and Filed: January 27, 2003

Before: MARTIN, Chief Circuit Judge; KRUPANSKY,
BOGGS, BATCHELDER, DAUGHTREY, MOORE,
COLE, CLAY, and GILMAN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Louis A. Jacobs, Columbus, Ohio, for Appellant.
James E. Davidson, SCHOTTENSTEIN, ZOX & DUNN,
Columbus, Ohio, for Appellee. **ON BRIEF:** John S.
Marshall, Columbus, Ohio, for Appellant. James E.
Davidson, SCHOTTENSTEIN, ZOX & DUNN, Columbus,
Ohio, for Appellee.

GILMAN, J., delivered the opinion of the court, in which MARTIN, C. J., DAUGHTREY, MOORE, COLE, and CLAY, JJ., joined. KRUPANSKY, J. (pp. 21-54), delivered a separate dissenting opinion. BOGGS, J. (p. 55), also delivered a separate dissenting opinion, in which BATCHELDER, J., joined.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge. Donald G. Wexler was hired as a sales representative by White's Fine Furniture, Inc. in September of 1993. He was 55 years old at the time. Less than two years later, Wexler was promoted to be the manager of the company's Morse Road store. Wexler, however, was demoted in June of 1997, after sales at the store had significantly declined. At a private meeting during which Wexler was informed of his demotion, the two senior corporate officers made several adverse references to Wexler's age. Wexler's age was again mentioned when the company's president announced the demotion to the store's other employees. During this same speech, the youth of Wexler's successor was emphasized.

Wexler filed suit against White's, claiming that his demotion violated the Age Discrimination in Employment Act (ADEA). The district court granted summary judgment to White's after concluding that Wexler was not qualified for his job as store manager and that, even if Wexler were qualified, White's had proffered a legitimate, nondiscriminatory reason for his demotion. A panel of this court affirmed the district court's decision, but we subsequently granted Wexler's petition for a rehearing en banc and vacated the panel's decision. For the reasons set forth below, we **REVERSE** the district court's grant of summary judgment and **REMAND** the case for further proceedings consistent with this opinion.

_____

## DISSENT

_____

BOGGS, Circuit Judge, dissenting. I agree with the legal analysis and the analysis of the factual record contained in Judge Krupansky's dissenting opinion. I therefore respectfully dissent.

stereotypes." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993). Congress' exclusive, and commendable, purpose underlying the ADEA was to penalize, and thereby deter, *unfounded, irrational* employment discrimination against persons which was animated purely by bias, prejudice, and ignorance. Absolutely no evidence, apart from speculation, conjecture, illogical "inferences," innuendo, hunches, intuitions, empty theorizing, and creative guesswork, tended to prove that White's committed that transgression. It was *not* Congress' intention to bestow immunity upon over-age-forty employees against any and all adverse employment decisions which a judge or juror may subjectively deem unwise, unfair, or ill-considered; nor was it Congress' desire to punish employers for recognizing that a faltering employee may be the unfortunate victim of some age-connected debilitating condition.

This case is fundamentally one in which "the evidence . . . is so one-sided that one party [the defendant] must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986). It is difficult to imagine a more compelling textbook exemplar of a paradigm age-discrimination-in-employment case which begs for the approval of the district court's decision.

Accordingly, I would affirm the district court's summary judgment for White's.

## I.  BACKGROUND

### A.  Factual background

White's owns and operates retail furniture stores in the greater Columbus, Ohio area. In September of 1993, Wexler was hired by Gordon Schiffman to work as a sales representative at the Morse Road store. Schiffman, the president, chief executive officer, and a controlling shareholder of White's, was in his mid-sixties at the time. In February of 1995, Wexler became the manager of the Morse Road store. Wexler was 57 years old when Schiffman promoted him.

Sales at the Morse Road store began to decline in late 1996. Between November of 1996 and May of 1997, for example, average monthly sales at the store were 30% lower than they had been the previous year. Wexler himself sold 48% less furniture during that time period than he had during the same six-month interval the prior year.

Schiffman, as president, and David Lively, the executive vice-president, met with Wexler on June 9, 1997. During this meeting, Schiffman expressed dissatisfaction with the store's declining sales and criticized Wexler for failing to fulfill certain aspects of his managerial duties. Wexler responded in writing to these criticisms the following day. His response included a discussion of the fact that furniture sales were declining nationwide. He also noted that, in early June, Lively had admitted that the declining sales were not Wexler's fault and that White's had scaled back advertising for the Morse Road store.

Schiffman and Lively advised Wexler six days later that the company planned to demote him to his former job as a sales representative. In order to encourage Wexler to accept the demotion, Schiffman and Lively offered him a higher commission on the furniture he sold than he had received when he was originally a sales representative. According to Wexler, he had the following exchange with Schiffman at the beginning of this meeting:

Gordon [Schiffman] had a smile on his face, said he had read the paper that I had given him [responding to Schiffman's criticisms], and that most of what I had written was correct. However, they have decided to make a change.

He then said, you're 60 years old, aren't you, Don? I said, no, Gordon. I'm 59. I'll be 60 in January. He then said, well, we both have been in the business 117 years. You don't need the aggravation, stress of management problems, customer problems, taking care of all these salespeople's problems that keep calling you to the phone all day every day.

Mr. Lively then interjected that they were going to really be grinding their managers in the future, and if they had to sweep floors or stay there until 11:00 p.m., they would do so. And he said it was stuff that I don't think you'd want to be doing.

Wexler accepted his new position as a sales representative on June 16, 1997. Later that evening, Schiffman telephoned Wexler to discuss how he would announce to the other employees that Wexler would no longer be the manager of the Morse Road store. During this conversation, Schiffman said that he would "just mention that you're getting older, although not as old as I am."

Wexler recorded the June 19, 1997 meeting during which Schiffman announced Wexler's demotion to the other employees. During his speech, Schiffman said the following:

I'm going to share with you a conversation that Don Wexler, David Lively and I started in January. Don came back to my office one day and said Gordon, I've been in my [sic] management for a bunch of years, and I'm not sure what I want to do. Maybe I should just be worrying about my own customer[s] and not everyone else's customers. This is getting to be tiring.

At that time we were interviewing for managers, because we needed somebody for this store. . . . But we did interview another guy that we thought was top

of the forbidden words, or even fleeting contemplation of the censored concept – *videlicet* that it may be possible that an objectively faltering employee's work product has deteriorated because he/she is no longer as young as he/she used to be -- can bring ruin to the hapless speaker or thinker, irrespective of his or her true, entirely innocent or immaterial, purpose or intentions. When all is said and done, the *en banc* court is remanding Wexler's case for a jury trial not because there is any evidence that Schiffman *did anything unlawful*, but exclusively because the court's *en banc* majority has interpreted non-existent evidence to buttress an inference that Schiffman had *said*, and *thought*, certain things which the court majority has deemed offensive.

Although a close scrutiny of the full potential implications of the circuit majority's decision, including the specter of a future Orwellian world of "thought crime" proscriptions enforced by the "thought police," is frighteningly breathtaking in its sprawling dimensions, the more immediate ramification resides in the risk of the chilling effect that the court majority's new stricture will necessarily impose upon employers within this circuit's geographical boundaries. An honest assessment by, and open, free, and frank discussions among, business decision-makers about the merits and demerits of employees who happen to be above age forty will be critically stifled, to the absurd point that a decision-maker will be required either to avoid mention of the employee's age, or speak at his and his company's peril if he makes even a passing reference to the age of a worker who is manifestly suffering from some evidently age-related, performance-inhibiting infirmity, ranging anywhere from Alzheimer's disease to mild hearing loss. Stated differently, it appears that, because a majority of the judges of this circuit may consider age references in the employment context to be offensive, employers will now be subject to penalization for stating the obvious.

To the contrary, Congress intended to punish employers who have unfairly deprived older persons of employment opportunities solely by reason of "inaccurate and stigmatizing

construed most favorably for Wexler, can lead to but one sustainable conclusion – that an unbiased, objective, rational fact-finder, knowledgeable in the applicable law, and uninfluenced by sympathy, passion, or personal interest, could not, in the absence of impermissible speculation or conjecture, conclude that White's had intentionally treated Wexler disparately because of animus against the elderly.

Ultimately, just as "[t]he 14th Amendment does not enact Mr. Herbert Spencer's Social Statics," *Lochner v. New York*, 198 U.S. 45, 65 (1905) (Holmes, J., dissenting), the Age Discrimination in Employment Act did not dignify, with the stature of law of the land, the notion that any person who recognizes that a cause-and-effect relationship may exist between a formerly productive employee's objectively-measurable progressive skills diminution and that employee's advancing age deserves to be punished in civil damages for that "wrongthink." Nonetheless, exhibiting a disregard for foundational constitutional separation of powers precepts, the circuit majority has exercised legislative authority by judicially amending the ADEA. *See Heller v Doe*, 509 U.S. 312, 319 (1993) (explaining that jurists, when reviewing ordinary economic and social legislation, are not charged with judging "the wisdom, fairness, or logic of legislative choices," nor does "the judiciary sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations;" rather, the courts must enforce a constitutionally-valid statute as drafted by the legislature). (Citations and bracketed material omitted).

The prescription which the circuit majority has engrafted upon the ADEA was unimagined by its framers. It transforms any written, spoken, or even implied expression by an employer's decision-maker, made in any context or for any reason, which references the age of an over-forty worker who is subsequently the subject of an adverse employment action, into proof of the speaker's personal belief that all persons over age forty are enfeebled incompetents. So potent is the exogenously-imported "age reference" talisman that, like some mystical incantation, the employer's singular utterance

drawer. We thought that he was just absolutely a terrific kid. He's about David [Lively]'s age, been in the furniture business about as long as David. He's about as intense as David is. He's a fine guy. His name is John Nielson [sic].

I think you will like him very much. He is a fine, proper young man. . . . Don't be misled by his youth anymore than being misled by David Lively's youth.

Wexler contends that the above-mentioned incidents were not the only times that his age was referred to in a pejorative manner by company officials. He claims that Lively had once offered to retrieve a pen from the floor that Wexler had dropped, "out of respect for [Wexler's] age." Lively had also once allegedly described Wexler to a manufacturer's representative as "a bearded, grumpy old man." Finally, Wexler claims that Lively had occasionally addressed him as "pops" or "old man." Lively was then in his early thirties.

John Neilson, who was hired as the new manager of the Morse Road store, was also in his early thirties at the time. Sales at the Morse Road store continued to decline under Neilson's supervision, and he was removed as manager approximately five months later. Neilson's successor, Alvie Crank, was in his mid-thirties when he was hired to manage the store. Under Crank, sales continued to decline. Store sales were $2,507,384 during 1998, as compared with over $4 million in sales during the last full year that Wexler was manager. Crank, however, was neither fired nor demoted as a result of the declining sales.

### B.   Procedural background

In April of 1998, Wexler filed a one-count complaint against White's in the United States District Court for the Southern District of Ohio, alleging age discrimination in employment. After discovery, White's moved for summary judgment. The district court granted the motion, ruling that Wexler's evidence failed to support his prima facie case and, even if Wexler had established a prima facie case, he had

failed to prove that the company's nondiscriminatory reason for demoting him was a pretext designed to mask age discrimination. A panel of this court then affirmed the district court's decision. *Wexler v. White's Fine Furniture, Inc.*, 246 F.3d 856 (6th Cir. 2001). In July of 2001, however, this court granted Wexler's petition for a rehearing en banc and vacated the panel's decision. We now take this opportunity to clarify several important, recurring issues in employment discrimination law, including the same-actor inference, the same-group inference, what is required for a plaintiff to satisfy the qualification prong of the prima facie test, and the business-judgment defense.

## II. ANALYSIS

### A. Standard of review

A district court's grant of summary judgment is reviewed de novo. *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000) (en banc). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering such a motion, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B. Evidence of age discrimination

Under the ADEA, an employer is prohibited from discharging older employees on the basis of their age. 29 U.S.C. § 623(a). An employee may establish a claim under the ADEA by offering either direct or circumstantial evidence of age discrimination. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997) (setting forth the manner in which a plaintiff may prove unlawful discrimination under the ADEA). There are thus two alternative ways for Wexler to

*See Dews*, 231 F.3d at 1021. Whether that business judgment was sound, in hindsight or otherwise, is irrelevant. *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) ("as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect. An employer has an honest belief in its reason for discharging an employee where the employer reasonably relied 'on the particularized facts that were before it at the time the decision was made.'") (citation omitted); *Brocklehurst v. PPG Industries, Inc.*, 123 F.3d 890, 898 (6th Cir. 1997) ("The soundness of the employer's business judgment . . . may not be questioned as a means of showing pretext.") (citation omitted).

The *en banc* majority's disposition could be persuasive if the plaintiff had been an aging manager whose *performance had not appreciably deteriorated* during his managerial tenure; or if material evidence existed which could support a finding that management had concluded that, *irrespective of his performance*, the plaintiff was no longer suited for a managerial role simply because he had celebrated some disqualifying number of birthdays. However, that plaintiff is not before this court. At bottom, the record evidence, when

---

*Reeves*, 530 U.S. at 148 (italics in original; boldface added).

*See also Rowe v. Marley Co.*, 233 F.3d 825, 830 (4th Cir. 2000) ("Even when a plaintiff demonstrates a *prima facie* case and pretext, his claim should not be submitted to a jury if there is evidence that precludes a finding of discrimination, that is if 'no rational factfinder could conclude the action was discriminatory.'"); *Schnable v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000) ("Following *Reeves*, we decline to hold that *no* ADEA defendant may succeed on a summary judgment motion as long as the plaintiff has established a *prima facie* case and presented evidence of pretext. Rather, we hold that the Supreme Court's decision in *Reeves* clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'") (emphasis the court's).

insufficient to warrant the challenged conduct [as an extended major downturn in store profitability is facially a legitimate business reason to relieve the store's manager of his duties].[21]

---

[21]Moreover, even if the plaintiff could prove that each of the defendant's proffered justifications, *including* the store's declining sales, were mere pretexts (which he cannot), he has not offered any evidence which proves that White's *actual motivation* was ageist bigotry. *Reeves*, 530 U.S. at 146-48. As developed herein, on the overall record construed most favorably for the plaintiff, a sound fact-finder simply could not conclude that the defendant targeted the plaintiff for adverse treatment because of his age, even if it were to reject the reasons given by White's for its action in controversy.

Under the Supreme Court's dictates in *Reeves*, summary judgment would be mandated for White's *even if* Wexler had submitted sufficient evidence which, if considered in a vacuum, could lead a rational jury to conclude that White's proffered reason for Wexler's demotion – inadequate sales figures – was not the true reason for his reassignment, because the overall proof, even construed most favorably for Wexler, leads to the inescapable conclusion that, *whatever* White's true reason for removing Wexler from management, it definitely was *not* motivated by stereotypic adverse assumptions about persons age forty or more, given the overwhelming uncontested proof of record that Schiffman was not predisposed towards negatively stigmatizing workers by reason of their advanced years. The high Court instructed:

> Thus, a plaintiff's [circumstantial] prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.
>
> This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability. Certainly **there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory**. For instance, an employer would be entitled to judgment as a matter of law [or summary judgment] if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or **if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred**.

meet his evidentiary burden to prove that he was demoted in violation of the ADEA. Direct evidence of discrimination is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred. *Kline*, 128 F.3d at 348.

### 1. Direct evidence

We first consider whether Wexler offered direct evidence of age discrimination. Wexler contends that the following six statements constitute direct evidence that unlawful discrimination was a motivating factor in his demotion:

(1) Schiffman's comment, during the meeting in which Wexler was demoted, "that you're 60 years old, aren't you, Don? . . . [W]ell, we both have been in the business 117 years. You don't need the aggravation, stress of management problems, customer problems, taking care of all these salespeople's problems that keep calling you on the phone all day every day."

(2) Lively's statement, at that same meeting, that White's was "going to really be grinding their managers in the future," making them do tasks that he did not think Wexler would want to be doing.

(3) Schiffman's comment during a telephone conversation with Wexler on June 16, 1997, when he said that he would explain to the other employees why Wexler would no longer be the manager by mentioning "that you're getting older, although not as old as I am."

(4) Schiffman's statement during his announcement of the demotion that Wexler had come to him and said: "I've been in my [sic] management for a bunch of years, and I'm not sure what I want to do. Maybe I should just

be worrying about my own customer[s] and not everyone else's customers. This is getting to be tiring."

(5) Schiffman's repeated references, during the same speech, to the youth of Wexler's replacement.

(6) Numerous prior references that Lively made about Wexler's age, including comments such as "a bearded, grumpy old man," "pops," and "old man."

The district court held that the above statements were "too abstract, irrelevant, and prejudicial to support a finding of discrimination." In reaching this conclusion, the court relied in part on the fact that Schiffman had been responsible for both hiring and demoting Wexler: "[I]n cases such as this where the hirer and firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." This inference is generally referred to as the "same actor" inference. *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 463 (6th Cir. 1995). The district court also emphasized that Schiffman was actually older than Wexler when he demoted Wexler. Considering the fact that the decisionmaker is a member of the same class as the plaintiff is referred to as making a "same-group" inference. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998).

### a. Mixed-motive analysis

In *Price Waterhouse v. Hopkins*, the Supreme Court announced a burden-shifting framework for cases where an adverse employment decision was the product of a mixture of legitimate and illegitimate motives. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 247 (1989) (detailing the "mixed-motive" analysis in a Title VII gender-discrimination action), *superseded by statute on other grounds as stated in Norbuta v. Loctite Corp.*, No. 98-4162, 2001 WL 45114, at *9 (6th Cir. Jan. 8, 2001) (unpublished table decision). Under this mixed-motive analysis, the plaintiff must produce direct

considered with regard to the plaintiff's job qualifications at the *prima facie* stage, the defendant's proffer of "performance dissatisfaction" remains a sufficient "legitimate nondiscriminatory reason" justifying an adverse employment action, which erases the presumption of discrimination created by the plaintiff's proof of his *prima facie* circumstantial case, and *which allegation the plaintiff must disprove. The circuit majority has conceded that much.* However, it has incorrectly concluded that a fact question remains for trial concerning whether Schiffman's "business judgment" that Wexler was no longer suited for a managerial assignment was a mere pretext masking actual discrimination.

To the contrary, the instant record evidenced beyond refutation that Schiffman's election to permit Wexler to revert to a salesperson status constituted an exercise of unreviewable business judgment, as has also been fully unfolded *supra*. Accordingly, *a fortiori*, the "business judgment" justification is a sufficient legitimate reason for White's faulted actions, which Wexler must disprove. At the pretext stage, the jury may not simply elect to disbelieve the employer's proffered legitimate nondiscriminatory explanation; rather, the plaintiff's evidence must be sufficient to disprove it. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994) ("The jury may not reject an employer's explanation, however, unless there is sufficient basis *in the evidence* for doing so. To allow the jury simply to refuse to believe the employer's explanation would subtly, but inarguably, shift the burden of persuasion from the plaintiff to the defendant, which we must not permit."). (Emphasis in original).

In the action *instanter*, the plaintiff could not prove that White's articulated reason for demoting him was pretextual, because he could not prove that White's reason (1) had no basis in fact [as demonstrated by the cascading escalation in the declining sales at the Morse Road store], (2) did not actually motivate the defendant's challenged conduct [as no evidence contradicted Schiffman's unimpeached testimony that he demoted Wexler primarily for that reason], or (3) was

employer's subjective legitimate expectations surmounted, at the *prima facie* stage, any evidence offered by the plaintiff to prove that he or she was "qualified" for the job at issue. *See, e.g., Ang v. Procter & Gamble Co.*, 932 F.2d 540, 549 (6th Cir. 1991); *McDonald*, 898 F.2d at 1160. Of course, a mere *allegation* by the employer that the plaintiff had not satisfied its legitimate expectations does not constitute *evidence*, and therefore such an allegation is not relevant at the *prima facie* stage, but instead may comprise a sufficiently-proffered legitimate nondiscriminatory reason for the faulted adverse employment action, which the *plaintiff must disprove* at the *pretext* stage. *See Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000) ("when assessing whether a plaintiff has met her employer's legitimate expectations at the *prima facie* stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff.").

However, the *en banc* majority has elected to alter the law of this circuit, which, of course, is its prerogative, as long as it does not violate the constitution or contradict Supreme Court precedent. *See, e.g., United States v. Washington*, 127 F.3d 510, 517 (6th Cir. 1997). The new rule set forth herein is that "[a]t the prima facie stage, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job. The prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field. Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." Majority Opinion, at 16. (Citations and parentheticals omitted; emphasis in original).

Conceding *arguendo* that an employer's subjective dissatisfaction with the plaintiff's performance should not be

evidence that the employer considered impermissible factors when it made the adverse employment decision at issue. *Price Waterhouse*, 490 U.S. at 244-46. Once the plaintiff has shown that the unfavorable employment decision was made at least in part on a discriminatory basis, the burden shifts to the employer to prove by a preponderance of the evidence that it would have taken the same adverse action even if impermissible factors had not entered into its decision. *Id*. at 258.

The plaintiff in *Price Waterhouse* was denied a partnership position after a long review process in which the partners' input on each candidate was solicited. Remarks made by several partners, when considered in the context of common stereotypes about women, indicated that at least some of the voting partners' actions were motivated by the plaintiff's gender. For example, she was criticized for "unfeminine" characteristics such as her clothing, the use of profanity, and her abrasive style. *Id*. at 234-36. Although the factual bases of these criticisms were not challenged by the plaintiff, it was the veiled connection between these perceived character traits and her gender that led a majority of the Court to conclude that there was sufficient evidence that gender discrimination was a motivating factor in her being denied a promotion to partner. *Id*. at 251.

Criticism of an employee's performance, even if true, which is linked to stereotypes associated with a plaintiff's membership in a protected class is therefore squarely within the rubric of a mixed-motive analysis. *Id*. at 258 ("It is not [the Court's] job to review the evidence and decide that the negative reactions to Hopkins were based on reality; our perception of Hopkins'[s] character is irrelevant. We sit not to determine whether Ms. Hopkins is nice, but to decide whether the partners reacted negatively to her personality because she is a woman."). The association of these stigmatizing beliefs with an adverse employment decision creates a genuine issue of material fact as to whether the employer was motivated, at least in part, by discriminatory intent based on those stereotypes. *Id*.; *Weberg v. Franks*, 229

F.3d 514, 523-26 (6th Cir. 2000) (holding that a supervisor's inclusion of a reference to the race of the plaintiff in a disciplinary report created a genuine issue of material fact regarding the employer's intent, even though the supervisor also stated in his deposition that he would have made the same employment decision irrespective of her race). *But see* Dissenting Op. at 53 (decrying this basic precept of employment discrimination law as "thought police" punishing "thought crime").

In a mixed-motive case such as this one, then, we are asked to determine whether the officers' statements reveal an adherence to a stigmatizing belief about older employees that was a motivating factor in the decision of White's to demote Wexler. Wexler has produced a series of statements by Schiffman and Lively that, if believed, indicate that age was at least a factor in their decision to demote him. These statements permit the inference that both the president and the executive vice-president of White's adhered to the stereotype that an older manager cannot perform in a high-stress management position where the company would be pushing him to work harder and do more.

The eradication of such stigmatizing beliefs is precisely what the ADEA was intended to target. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993) ("Congress'[s] promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes."). Nevertheless, instead of drawing inferences favorable to Wexler from the above statements as required by Rule 56 of the Federal Rules of Civil Procedure, the district court elected to believe the explanation of the company's officers and imposed its own credibility assessment on both parties. The widely differing perspectives on whether these statements reveal a discriminatory motivation provide a classic example of a genuine issue of material fact; that is, did White's hold stereotypical beliefs about the capabilities of older managers that influenced its decision to demote Wexler?

intentionally discriminated against him.[20] *Reeves*, 530 U.S. at 147-48.

As developed above, the record evidence must be construed in the light most favorable to Wexler, the opponent of summary judgment. By that standard, no dispute exists that he can provide sufficient evidence to support at least three elements of his circumstantial case – he was a member of the protected class (age 59), he was subjected to an adverse employment action (demotion from management), and he was replaced by a person who was significantly younger than him and not a member of the protected class (Neilson, a man in his early 30s). However, whether the plaintiff could prove, to the satisfaction of a rational jury, the remaining *prima facie* element, namely that he was *qualified* for the managerial post from which he was eliminated, is open to debate. In any event, as developed below, even assuming for the sake of analysis that Wexler had produced sufficient evidence to satisfy a rational jury on all four elements of his *prima facie* case, he did not meet his burden of proffering sufficient proof at the "pretext" stage.

Under prior Sixth Circuit authorities, the plaintiff must prove, at the *prima facie* stage, "that he was performing his job at a level which met his employer's legitimate expectations," in order to prove that he was "qualified" for the job in controversy. *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 372 (6th Cir. 1999) (*quoting McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990)). Conversely, proof supplied by the defendant that an employment discrimination plaintiff had *not* satisfied his

---

[20]"The ultimate question is whether the employer intentionally discriminated, and proof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason is correct. In other words, it is not enough to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 146-47 (2000) (quotations, brackets, and ellipses omitted; italics the Court's).

defendant to submit "a legitimate, nondiscriminatory reason" for taking the assailed adverse employment action. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (*quoting St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)). Once the defendant "has met this burden by offering admissible evidence sufficient for the trier of fact to conclude that petitioner was fired because of" a legitimate, nondiscriminatory reason, such as, for example, his "failure to maintain adequate attendance records," the plaintiff-friendly presumptions of the *McDonnell Douglas* circumstantial evidence paradigm disappear. *Reeves*, 530 U.S. at 142-43 (citations omitted).

At that point, "the sole remaining issue [is] discrimination *vel non*." *Id*. at 143 (citation omitted). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253 (citations omitted). To meet his or her ultimate burden of proof, the plaintiff must persuade the fact-finder, via direct, circumstantial, or statistical evidence, that the defendant's tendered legitimate, nondiscriminatory rationale for subjecting the plaintiff to an adverse employment action was a mere pretext masking an actual discriminatory intent. *Id*. at 255-56. "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000) (citation omitted). However, although proof that the employer's offered reason was unworthy of credence may be highly probative circumstantial evidence of an actual discriminatory motive, it is not necessarily *sufficient* to prove actual discrimination, as the plaintiff's ultimate burden is to prove that the defendant

A factfinder could reasonably conclude that the above-listed statements evinced a discriminatory intent. They were made by the decisionmaker, indicated a belief that a person's capabilities as a store manager diminish with age, and the first five were directed at Wexler at the very time he was being demoted.

### b.   Same-actor inference

The district court concluded its analysis by emphasizing that the "same-actor" inference favored White's. In *Buhrmaster v. Overnite Transportation Co.*, 61 F.3d 461 (6th Cir. 1995), this court adopted the same-actor inference, "which allows one to infer a lack of discrimination from the fact that the same individual both hired and fired the employee." *Id*. at 463. But the facts in *Buhrmaster* did not contain any direct evidence of stereotyping from which a discriminatory intent could be proven. The evidence against the employer, in fact, was rather weak. Moreover, the *Buhrmaster* court was reviewing a jury verdict and jury instructions. Rather than weighing the evidence, as the district court did in this case, the court in *Buhrmaster* was simply evaluating the rationality of the jury's verdict, and whether or not the jury could properly apply such an inference.

Our sister circuits are split on the amount of weight that should be given to the same-actor inference. Some have found it quite persuasive. *See, e.g.*, *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 271 (9th Cir. 1996) (holding that the plaintiff's evidence was insufficient as a matter of law to rebut the strong same-actor inference); *Lowe v. J.B. Hunt Transp., Inc.*, 963 F.2d 173, 174 (8th Cir. 1992) ("The most important fact here is that plaintiff was a member of the protected age group both at the time of his hiring and at the time of his firing, and that the same people who hired him also fired him."); *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991) (urging the early dismissal of cases where the same individual both hired and fired the plaintiff). A number of these courts have concluded, however, that the same-actor

inference was sufficient to warrant summary judgment only where the plaintiff's evidence of discrimination was otherwise weak, even though sufficient to survive summary judgment but for the fact that the same person both hired and fired the plaintiff. *Bradley*, 104 F.3d at 270 (noting that the plaintiff "produced no meaningful evidence indicating either that [the employer's] proffered explanation was false or that her supervisor harbored discriminatory animus towards her because she was a woman"); *Lowe*, 963 F.2d at 174-75 (holding that the same-actor inference warranted summary judgment because the plaintiff's evidence of pretext was "thin").

Other circuits have minimized the importance of the same-actor inference, emphasizing that although a court may infer an absence of discrimination where the same individual hired and fired the plaintiff, such an inference is not required. *Haun v. Ideal Indus., Inc.*, 81 F.3d 541, 546 (5th Cir. 1996) ("While evidence of [same actor] circumstances is relevant in determining whether discrimination occurred, we decline to establish a rule that no inference of discrimination could arise under such circumstances."); *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 496 n.6 (3d Cir. 1995) (noting that the same-actor inference "is simply evidence like any other and should not be afforded presumptive value").

This latter approach is more consistent with the requirement that, in considering a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). We therefore reject the idea that a mandatory inference must be applied in favor of a summary-judgment movant whenever the claimant has been hired and fired by the same individual. Such an approach strikes us as being contrary to the Supreme Court's opinion in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed

separating his elevation of the over-forty plaintiff to the manager's desk from his restoration of the plaintiff to the sales floor. Finally, even if the tendered direct evidence could be construed by a rational fact-finder to support an inference of age-driven disparate treatment (which it does not), the defendant's proof that Schiffman exercised legitimate business judgment by replacing Wexler with a new manager because of the Morse Road store's persistent under-performance and profitability decline independently justified the subject adverse employment action, thereby dissipating any purported discriminatory taint. *On the subject record*, the "business judgment" affirmative defense is unassailable.

Precisely the same failures of the plaintiff's material proof, coupled with the same overwhelming uncontroverted evidence favorable to the defendant, are fatal to the plaintiff's *circumstantial* case. To prove a *prima facie* case of age discrimination in employment founded upon circumstantial evidence, the plaintiff must satisfy the standards first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) – he must evince:

> 1) that he is a member of a protected group, 2) that he was subject to an adverse employment decision, 3) that he was qualified for the position, and 4) that he was replaced by a person outside of the protected class.[19]

*Kline v. Tennessee Valley Authority*, 128 F.3d 337, 349 (6th Cir. 1997) (citations omitted). *See also Gagné v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 313 (6th Cir. 1989).

If the plaintiff proves those four circumstantial elements by a preponderance of evidence, the burden of *production* (but not the burden of proof, *see* note 10 above) then shifts to the

---

[19]The Supreme Court has modified the fourth element to encompass a replacement worker who was also a member the protected categorization, yet significantly younger than the plaintiff. *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311-12 (1996).

potent pro-defendant inference is magnified when, as in the case at bench, the material decision-maker was himself older than the plaintiff, and hence was himself a member of the protected class.

In summary, the plaintiff has failed to prove, by direct evidence, that White's intentionally discriminated against him because of his age. The evidence reflected that Schiffman, the pertinent decision-maker, elected to re-assign the plaintiff because of his store's unacceptably dismal long-term sales record. No evidence of ageist bias by Schiffman against Wexler, or anyone else, has been offered. The absence of direct material proof in support of Wexler's charge of disparate treatment is compounded by the compelling inference of a *non-discriminatory* motive for Schiffman's action, given his own age and the relatively short interval

---

should dispel that doubt.

Indeed, the Fourth Circuit has classified the "same-actor" inference as "compelling" in *most* circumstances, and has encouraged its application on summary judgment:

> While we can imagine egregious facts from which a discharge in this context [where the plaintiff was hired after age 40 and was subsequently discharged by the same person who had hired him] could still be proven to have been discriminatory, *it is likely that the compelling nature of the inference arising from facts such as these will make cases involving this situation amenable to resolution at an early stage.*
>
> . . . .
>
> The relevance of the fact that the employee was hired and fired by the same person within a relatively short time span . . . creates a strong inference that the employer's stated reason for acting against the employee is not pretextual.

*Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991) (emphasis added). However, it is unnecessary to accord "compelling" weight to that inference, standing alone, to resolve the case presently on *en banc* review; therefore this court need not now address the question of the precise weight to be accorded to that inference.

---

verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Although the factfinder is permitted to draw this inference, it is by no means a mandatory one, and it may be weakened by other evidence. *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 464 (6th Cir. 1995) (describing how the length of time between hiring and firing an employee may weaken the same-actor inference). We therefore specifically hold that where, as in this case, the factfinder decides to draw the same-actor inference, it is insufficient to warrant summary judgment for the defendant if the employee has otherwise raised a genuine issue of material fact.

### c.    Same-group inference

The district court also invoked the "same-group" inference in holding that Wexler's direct evidence of discrimination was inadequate for his claim to survive summary judgment. By emphasizing that Schiffman was actually older than Wexler when he demoted Wexler, the district court was relying on the idea that one member of a group is unlikely to discriminate against another member of the same group. This inference has been explicitly rejected by the Supreme Court in the context of race and sex discrimination. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (explaining that "[b]ecause of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group") (internal quotation marks omitted). We see no reason why the same reasoning should not apply to age discrimination cases. *Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 361 (7th Cir. 2001) (explaining that the Seventh Circuit's "emphatic" rejection in a prior case of the idea that one member of a protected class is unlikely to discriminate against another member of the same protected class in race-discrimination cases "applies with equal force to proof of age discrimination"). Thus, the district court erred when it invoked the same-group inference at the summary judgment stage.

### 2.    *Circumstantial evidence*

Although we believe that this case is properly analyzed under the *Price Waterhouse* mixed-motive framework, there is also sufficient evidence to support the conclusion that Wexler satisfied the burden-shifting analysis for circumstantial evidence outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).    A three-step framework guides the analysis of age-discrimination claims based upon circumstantial evidence. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998) (explaining the burden-shifting analysis for ADEA claims). This framework first requires an employee to establish a prima facie case of age discrimination. *Id*. If the employee meets this burden, the employer may respond by offering a legitimate, nondiscriminatory reason for the adverse employment action at issue. *Id*. Assuming that such a response is made, the employee then bears the burden of rebutting this proffered reason by proving that it was a pretext designed to mask age discrimination. *Id*.

#### a.    *Prima facie case*

The district court held that Wexler could not establish a prima facie case because he was not qualified for his job as manager of the Morse Road store.  This conclusion was based upon the undisputed fact that the store's sales were declining, from which the court inferred that Wexler "did not meet his employer's legitimate expectations."    This conclusion is flawed for two reasons.

First, a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case.  To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000) ("[W]hen assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's

ten years older than Wexler, made all decisions pertinent to Wexler's employment, including his initial hiring, his promotion to management, and his reassignment to a sales representative slot following his unimpressive two-year-and-four-month stint as a store manager.  Those undisputed facts germinate two powerful evidentiary inferences – (1) the "same-actor" inference, which supports the conclusion that a person who hired an age-protected employee, but who later demotes or discharges that same employee, probably was not motivated by ageist bias; and (2) the "same-group" inference, which buttresses the conclusion that an age-protected decision-maker who hires, and subsequently demotes or discharges, an age-protected employee, probably did not discriminate against the employee by reason of age.

"[W]here the hirer and firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 463 (6th Cir. 1995).  "It is simply incredible that the company officials who hired an employee at age fifty-one had suddenly developed an aversion to older people two years later." *Id*. (ellipse and brackets omitted) (*quoting Lowe v. J.B. Hunt Transport, Inc.*, 963 F.2d 173, 175 (8th Cir. 1992)). *See also Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991) ("In short, employers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing").[18]    That already

---

[18] The court majority has correctly concluded that, as a general rule, the "same-actor" inference is permissive rather than mandatory; and that the "same-group" inference is not always sustainable, because it is conceivable that a class-protected person might discriminate against other members of his or her own group.  However, in the case *sub judice*, the confluence of the two inferences, coupled with the overall record, compels a judgment for the defendant.  As developed herein, the plaintiff has proffered no probative direct evidence of discrimination, and therefore the pro-defendant inferences are unnecessary.  However, to the extent that any doubt may linger in any person's mind concerning the suitability of summary judgment for the defendant, the subject inferences

an employee whose productivity or performance is unsatisfactory *to the employer*.[17]

Moreover, the conclusion that the four averred remarks by Schiffman, and two by Lively, were facially insufficient to directly prove age-motivated employment discrimination, is powerfully reinforced by the incontrovertible counter-inferences which any rational trier of fact would be compelled to make on the total proof *sub judice*, especially given two *uncontested* material facts: (1) Wexler was 55 years old at the time of his initial hiring as a White's sales representative, and was 57 years old when elevated to management less than one and one-half years later; and (2) Schiffman, who was almost

---

material issue of fact on the question of his work merely by challenging the judgment of his supervisors."

*McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990) (ellipse in original; citations omitted; brackets added).

[17] For that reason, testimony by the plaintiff and his former subordinates, which gainsaid the soundness of Schiffman's *business judgment* or questioned the defendant's *motivations*, was irrelevant, as the opinions and judgments of the plaintiff and his former co-workers cannot create a triable issue of fact regarding whether the employer was justified in concluding that its employee's performance was unsatisfactory. *See, e.g., Johnson v. United States Dept. of Health and Human Services*, 30 F.3d 45, 47 (6th Cir. 1994); *O'Shea v. Detroit News*, 887 F.2d 683, 687-88 (6th Cir. 1989); *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987).

Wexler has argued, unconvincingly, that the affidavits of his former subordinates are probative of the *factual* question whether he actually committed the charged specific acts of unsatisfactory managerial performance, such as poor recordkeeping, failure to mail "thank-you" cards to buyers, inadequate attention to salesperson training and counseling, and failure to maintain the store premises. However, no genuine, material jury question exists concerning those issues, because, even if Schiffman's specific charges of incompetent performance against Wexler were not borne out by record evidence, the crucial fact is that the evidence is uncontested that Wexler's store suffered a catastrophic enduring retraction in sales traffic during his final seven months as its manager. That fact independently supplied a sufficient business justification for purging Wexler from the ranks of management.

evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff.").

Second, there is insufficient proof in the record for us to conclude that Wexler was unqualified, as a matter of law, because of the store's declining sales. The district court cites *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990) (quotation marks omitted), for the rule that a qualified individual must perform "at a level which met his employer's legitimate expectations." In *McDonald*, however, the plaintiff conceded that he was not performing at this level. *See id*. Wexler, on the other hand, disputes the contention that he was unqualified. He argues that the drop in sales was due to factors other than his performance and, further, he proffered evidence challenging the criticisms of his skills that White's initially raised as the reason to demote him.

In *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365 (6th Cir. 1999), a manager's employment was terminated when the portion of the business over which he had control was dropped due to low revenue. The employer, Hess & Clark, argued that the decrease in revenue was enough to find that the manager was not "meeting his employer's legitimate expectations." *Id*. at 372. But because the terminated manager had proof that he was not solely responsible for the drop in revenue, this court held that there was sufficient evidence to create a genuine issue of material fact on the qualifications prong of the prima facie case. *See id*. at 372. *Godfredson*'s analysis of this issue directly applies to the case at bar:

Whether Godfredson was so qualified at the time of his termination is a close question. Certainly, [the] testimony [of the manager who terminated Godfredson] and the significant losses suffered by Hess & Clark . . . support a finding that Godfredson was not meeting his employer's legitimate expectations. [The] testimony [of the president of Hess & Clark], however, reveals that Godfredson was not necessarily the sole party at fault for

this failure. Moreover, Godfredson worked satisfactorily at Hess & Clark for years prior to the pet food business's failure, and one can infer that he would not have been given significant responsibility . . . if his performance had been unacceptable. For these reasons, we agree with the district court that Godfredson had raised a genuine issue of material fact as to this issue.

*Id*. For essentially the same reasons, we conclude that the district court erred in determining that Wexler was unqualified as a matter of law.

Given the district court's confusion regarding what evidence was relevant to the question of whether Wexler was qualified, we take this opportunity to explicitly set forth what is required for a plaintiff to satisfy the qualification prong of the prima facie test. At the prima facie stage, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job. *See Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1298 (D.C. Cir. 1998) (en banc) (noting that "courts traditionally treat explanations that rely heavily on subjective considerations with caution," and that "an employer's asserted strong reliance on subjective feelings about the candidates may mask discrimination"); *MacDonald v. E. Wyo. Mental Health Ctr.*, 941 F.2d 1115, 1121 (10th Cir. 1991) (holding that a plaintiff can show that she is qualified by presenting "credible evidence that she continued to possess the *objective qualifications* she held when she was hired") (emphasis added). The prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field. Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills.

Of greater concern, however, is the conveyed inference to jurors that, in age discrimination cases, it is permissible to conduct twelve-vote plebiscites on the social, political, and economic evils of age-related employment discrimination, and consequently return a politicized verdict fashioned as a voice-of-the-common-man-style "message" to employers. To the contrary, the only permissible objective of a jury verdict is the effectuation of a just and lawful resolution of an actual case in controversy between specific litigants. If a "rational" jury could, in the case now before this court, justifiably discount or ignore the mountain of undisputed proof supportive of the defendant, and draw liability-triggering inferences against the defendant based upon exceedingly weak or nonexistent proof, then there is no age discrimination in employment case that any over-forty worker could invent which would not pose an essential jury question unresolvable by pre-trial summary procedures.

Contrary to the *en banc* majority's conclusion, an employee's reassignment instigated by the employer's subjective business judgment, *supported by objective evidence*, that the employee's *actual performance* was substandard, should constitute an insurmountable affirmative defense to a "direct evidence" or "mixed-motive" charge of age-inspired intentionally disparate treatment, irrespective of whether the employer may have believed that the perceived inadequacy of the plaintiff's actual job performance may have been influenced, in whole or in part, by age-related disabilities. *See Ang v. Procter & Gamble Co.*, 932 F.2d 540, 549 (6th Cir. 1991) (positing that an employee is not qualified for his job if he "was not performing to his employer's satisfaction.").[16] Congress did not intend to protect the job of

---

[16] This court has also propounded:

In order to show that he was qualified, [the plaintiff] must prove that he was performing his job "at a level which met his employer's legitimate expectations." Moreover, "if [the plaintiff] was not doing what his employer wanted him to do, he was not doing his job. . . . [The plaintiff] does not raise a

not relevant to this case; nor did the alleged comparative deficiencies in the performance of the younger managers who succeeded Wexler retroactively transmute the employer's earlier unbiased business judgment into ageist discrimination. Likewise, conjecture that Schiffman might have treated the plaintiff more generously if he had been younger was unfounded in any admissible proof, and hence no genuine and material, and thus triable, jury question existed on that issue. *See Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002) (ruling, in an employment retaliation case in which no evidence had contradicted the testimony of the employer's decision-makers that they did not know about the plaintiff's protected activity when they imposed the faulted adverse employment action against him, that summary judgment for the defendant was mandated, because "the inferences plaintiff sought to draw from evidence were akin to flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from personal experience."). (Citation, brackets, and quotation marks omitted).

A rational jury cannot simply discredit or ignore stipulated, uncontested, or unimpeached material evidence merely because it supports the cause of a disfavored litigant. *See Reeves*, 530 U.S. at 151 (directing that a jury must credit evidence "that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."); *NLRB v. Garon*, 738 F.2d 140, 142 (6th Cir. 1984) (recognizing that a credibility issue for fact-finder resolution exists only when the record contains conflicting evidence). Although Schiffman was an "interested witness," the majority's suggestion that a jury might elect to disbelieve Schiffman's stated reason for reassigning Wexler, *irrespective of Wexler's concession of the objective factual truth of his store's declining sales*, which is a facially sufficient justification for Wexler's reassignment, invites impermissible jury nullification of the law and a concordant wrongful imposition of a monetary penalty against an employer for merely not making the business decision which the jurors think, in hindsight, that he should have made.

### b.    Pretext

The district court also held that, even assuming that Wexler had created a genuine issue of material fact on the issue of qualifications, White's had articulated a legitimate, nondiscriminatory reason for his demotion; namely, the store's declining sales. According to the district court, Wexler's "attempts to explain the decline in sales is nothing more than a challenge to the soundness of his employer's judgment in holding him responsible for the performance of the store while under his management." The district court thus held that Wexler "failed to produce sufficient evidence from which a jury could find that the articulated reason was pretextual."

White's maintains that the primary reason for demoting Wexler was that the store was experiencing low revenue. Although a rational trier of fact might believe this explanation, there is sufficient contrary evidence to support the conclusion that this reason was a pretext designed to hide discrimination. A plaintiff can refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment action "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).

The district court based its conclusion that the reason proffered by White's was not pretextual on an unwarranted deference to the "business judgment" defense. Similarly, the dissent insists repeatedly that because White's did, in fact, experience declining sales, failure to grant summary judgment to White's "invites impermissible jury nullification of the law." Dissenting Op. at 40. An employer's business judgment, however, is not an absolute defense to unlawful discrimination. *E.E.O.C. v. Yenkin-Majestic Paint Corp.*, 112 F.3d 831, 835 (6th Cir. 1997) ("Although it is true that a factfinder should refrain from  probing an employer's business judgment, a decision to terminate an employee based

upon unlawful considerations does not become legitimate because it can be characterized as a business decision.").

This court has held that the reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation. *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998) (holding that, in evaluating a proffered nondiscriminatory basis for an employment action, courts should inquire into "whether the employer made a *reasonably informed and considered decision* before taking an adverse employment action") (emphasis added); *In re Lewis*, 845 F.2d 624, 633 (6th Cir. 1988) ("Sears does not have to establish that the basis on which it acted in firing Lewis was *sound*; rather, Lewis has the burden of demonstrating that Sears' stated reasons are pretextual. One way for Lewis to do this is to show that Sears' asserted business judgment was so ridden with error that defendant could not honestly have relied upon it.") (emphasis in original) (internal quotation marks omitted). The *Lewis* court based its decision in part on *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 259 (1981), in which the Supreme Court explained that "[t]he fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, *although this may be probative of whether the employer's reasons are pretexts for discrimination*." (Emphasis added.)

Several of our sister circuits have similarly concluded that the reasonableness of a business decision is critical in determining whether the proffered judgment was the employer's actual motivation. *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc) ("If a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate—something that employers do not usually do, unless some other strong consideration, such as

employer's business judgment are not contested (in the case in controversy, Wexler's persistently plummeting sales figures), the defendant's business judgment *conclusion* derived from those facts (in the subject case, that the store's long-term unsatisfactory sales performance warranted the replacement of its incumbent manager) is not subject to judicial or juror reassessment. Stated differently, although the *veracity* of the employer's reasons for making a faulted business judgment may pose a jury question if those reasons are in factual controversy, the *soundness* of the employer's business judgment is beyond scrutiny. *See, e.g., Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 369-72 (6th Cir. 1999); *In re Lewis*, 845 F.2d 624, 633 (6th Cir. 1988).

In the action *instanter*, the *factual truthfulness* of the demotion "trigger" offered by White's – long-term declining merchandise turnover at Morse Road – was conceded by Wexler. Moreover, despite the plaintiff's fervent speculations, *no probative evidence*, whether direct, hearsay, circumstantial, or inferential, gainsaid Schiffman's contention that he reassigned Wexler for his stated reason. Furthermore, the record is absent any impeachment evidence which might be construed to impugn, in any way, Schiffman's general character, personal integrity, or reputation of honesty and veracity. Accordingly, no credibility issue awaits juror resolution.

Therefore, whether Schiffman's decision was fundamentally sound, in the sense of being rational or fair, is

---

age-inspired disparate treatment; and (3) White's decision to indulge more tolerance towards Crank's underachievement than it had shown the prior two managers (Wexler and Neilson) was a business judgment made in the light of experience gained consequent to an extended period of depressed sales under the two predecessor managers, which benefit of experience White's did not have at the time that it made its initial business judgment that Wexler's performance was unacceptable. *See Mitchell v. Toledo Hospital*, 964 F.2d 577, 582-83 (6th Cir. 1992) (explaining that evidence that a non-protected "comparable" employee was accorded comparatively superior treatment is probative only if the alleged "comparable" was similarly situated to the plaintiff in all material respects).

To the contrary, the record evidence was uncontroverted that, during the final seven months of Wexler's managerial administration, the Morse Road outlet's total revenues declined 30.25%, and Wexler's personal sales decreased 48%, vis a vis the congruent period during the preceding twelve-month interval. Furthermore, *Wexler has conceded his understanding that the company would deem him to be personally responsible for his store's transaction figures*.

Federal law does not immunize elderly workers from *all* forms of unfair employment treatment *per se*; rather, it shields them only from unfair treatment *incited by age-related prejudice*.[15] If the *facts* which form the basis of an

[15]*See Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998) (positing that federal employment discrimination laws have created no "general civility code for the American workplace," but instead proscribe only discrimination for statutorily specified reasons); *Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1996) ("The law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with. Rather, employers may not hire, fire, or fail to promote for impermissible, discriminatory reasons."); *Batts v. NLT Corp.*, 844 F.2d 331, 337 (6th Cir. 1988) ("The ultimate question to be resolved is whether the employer treated some people less favorably than others because of their race [or other legally protected characteristic], not whether the employer treated an employee less favorably than someone's general standard of equitable treatment.") (brackets added; citation omitted); *Wrenn v. Gould*, 808 F.2d 493, 502-03 (6th Cir. 1987) (commenting that merely questioning the defendant's business judgment does not comprise evidence that the defendant acted for a discriminatory reason).

Accordingly, the evidence, cited by the court majority, that Alvie Crank, a man in his mid-thirties who replaced Neilson in approximately November or December 1997 as the Morse Road store manager, had, like Wexler and Neilson, also presided over continuously disappointing sales tallies, but nonetheless remained the store manager at the time of Schiffman's December 3, 1998 deposition, was entirely non-probative of the question of Schiffman's motivations for demoting Wexler in June 1997, for at least three reasons: (1) Crank did not replace Wexler, and therefore his circumstances were too remote in time to provide a valid comparable; (2) if White's had treated Crank more favorably than Wexler, it had also treated him more favorably than Neilson, a man of approximately equivalent age as Crank, which dispels any inference of

discrimination, enters into the picture.") (footnote omitted); *Ryther v. KARE 11*, 108 F.3d 832, 840 (8th Cir. 1997) (holding that the factfinder was allowed to consider whether the survey that the employer relied upon as the basis for its decision to fire the plaintiff "was actually a sound—as opposed to pretextual—basis upon which to make employment decisions"); *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988) ("Thus, facts may exist from which a reasonable jury could conclude that the employer's 'business decision' was so lacking in merit as to call into question its genuineness."); *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n.6 (1st Cir. 1979) ("The reasonableness of the employer's reasons may of course be probative of whether they are pretexts. The more idiosyncratic or questionable the employer's reason, the easier it will be to expose it as a pretext . . . .").

The district court therefore erred by invoking the business judgment rule to exclude consideration of evidence relevant to the question of pretext. As a result, the district court ignored inferences in favor of Wexler that can be drawn from the evidence about whether it was reasonable to blame him for the Morse Road store's declining sales. Wexler produced evidence indicating that White's was aware that the decline in revenue was not his fault. He pointed to evidence showing that the management of White's knew that the company's advertising strategy had hurt sales throughout the chain, including a decrease in sales at the Morse Road store. If believed, a trier of fact could reasonably infer that the justification for Wexler's demotion was insufficient to warrant the adverse decision. When combined with the age-related statements of Schiffman and Lively, a reasonable factfinder could infer that impermissible considerations tainted their assessment of Wexler's performance as the store manager.

Finally, Wexler put forth evidence that Alvie Crank, a subsequent and much younger manager, was retained despite similarly dismal profits. The district court did not consider Crank's retention as the store's manager to be material,

however, because the intervening replacement, Neilson, who was also younger than Wexler, was fired after approximately five months. Although the evidence regarding Crank is not as persuasive as it would have been had he directly replaced Wexler, that does not diminish the fact that the company's willingness to retain Crank in the face of declining sales calls into question Schiffman's veracity when he claimed that he would have retained Wexler but for the revenue problems. The retention of Crank as Wexler's replacement-once-removed thus undermines the explanation that store revenue is critical to a store manager's job security. This is an inference that must be drawn, at summary judgment, in favor of the nonmovant.

In sum, this is a case that on its facts could go either way. This means that a jury's verdict in a properly tried case would likely be sustained regardless of whether the verdict was in favor of Wexler or in favor of White's. But that is precisely the point. The conflicting proof and the inferences that can be drawn therefrom raise genuine issues of material fact that preclude the grant of summary judgment in the case before us. Although the dissent labors long and hard in marshaling all the facts and inferences in support of White's, this does not, in our opinion, diminish the contrary evidence to the point that "it is so one-sided that [White's] must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### III.  CONCLUSION

For all of the reasons set forth above, we **REVERSE** the district court's grant of summary judgment and **REMAND** the case for further proceedings consistent with this opinion.

position *despite* his youth, which he believed should not be deemed a liability.[14]

The mere recognition, by an employer, of the universally known truth that *certain individuals* (as opposed to *every* individual in the protected age-defined category) may experience declining personal capabilities as they approach the traditional age of retirement, is not illegal; nor does an employer's expression of belief that a youthful employment candidate is qualified for a particular job irrespective of his years constitute proof of bias against the elderly. Nothing in Schiffman's statements suggested, directly or indirectly, that he reassigned Wexler because of his age in the abstract, *as opposed to his declining actual performance. See Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 88 (2000) ("the employer *cannot rely on age **as a proxy*** for the employee's remaining characteristics, *such as productivity*, but must instead focus on those factors directly.") (emphases added; brackets omitted) (*quoting Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993)). Unlike the plaintiff in *Ercegovich v. Goodyear Tire and Rubber Co.*, 154 F.3d 344 (6th Cir. 1998), Wexler has produced no evidence that any material decision-maker(s) had, by word or deed, evidenced a stereotype-driven bias or prejudice against members of his legally protected class which may have prejudiced the deliberative process underlying the adverse employment action.

---

[14]The pertinent segment of Schiffman's address to his employees bears reiteration:

> We thought that he was just absolutely a terrific kid. He's about David's age, been in the furniture business about as long as David. He's about as intense as David is. He's a fine guy. His name is John Nielson [sic].
>
> I think you will like him very much. He is a fine, proper young man. *Don't be misled by his youth anymore than being misled by David Lively's youth.*

(Emphasis added).

bigotry, or ill will towards the elderly, nor did they betray any adverse judgment(s) concerning Wexler's suitability for his managerial assignment which may have germinated from negative stereotypical assumptions against persons of advancing years.[13]

To the contrary, Schiffman's statements revealed nothing more than a desire to furnish Wexler with a graceful exit supported by a dignified official predicate explanation for his reassignment. Indeed, Wexler characterized Schiffman's announcement to the employees regarding his job reassignment as "gracious." Furthermore, that announcement could not be reasonably construed to reveal any judgment by Schiffman that Neilson (Wexler's replacement) possessed superior assets or qualifications *because* of his comparative callowness; rather, Schiffman unambiguously expressed the opinion that Neilson was qualified for the management

---

remarks" by a company agent which were not related to the decision-making process and are not proved to have been made proximate to the assailed adverse employment action cannot constitute sufficient direct evidence of age-inspired employment discrimination to create a jury question. *See Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330-31 (6th Cir. 1994); *see also Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025-26 (6th Cir. 1993); *Gagné v. Northwestern Nat. Ins. Co.*, 881 F.2d 309, 314 (6th Cir. 1989) (mandating that a solitary ambiguous statement was "too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination.") (citations omitted).

[13]A comparison of the sexist criticisms of the female plaintiff in *Price Waterhouse*, with the alleged ageist criticism of Wexler by Schiffman and Lively, illuminates the material distinction avoided by the majority of this court. In *Price Waterhouse*, prior to its refusal to elevate the plaintiff to the partnership ranks, management had criticized her for her "unfeminine" characteristics, including her taste in apparel, profane speech, and aggressive personality. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 234-36 (1989). Those criticisms were gender-specific and betrayed a stereotypic stigmatizing belief that a successful professional woman must conform to standards unique to females and distinct from those applicable to her male colleagues. By contrast, no one criticized Wexler for looking, dressing, speaking, or behaving inappropriately "for an 'old man.'" Rather, he was criticized only for his unsatisfactory sales figures and other performance deficiencies.

---

---

## DISSENT

---

KRUPANSKY, Circuit Judge, dissenting. In this action commenced pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*, the plaintiff-appellant, Donald G. Wexler ("Wexler"), has challenged the district court's summary judgment for the defendant-appellee White's Fine Furniture, Inc. ("White's), by which it resolved that the plaintiff had failed to proffer legally sufficient direct or circumstantial evidence to support his *prima facie* case. Alternatively, the trial court directed that, even assuming *arguendo* the existence of adequate circumstantial proof buttressing the plaintiff's age discrimination charge, the defendant had proffered a valid nondiscriminatory reason for its subject actions, whereas the plaintiff had not countered that reason with evidence of pretext legally sufficient to muster a triable jury question. On review, the *en banc* majority of this court has agreed with Wexler that the record evidence created a triable inference of discriminatory intent, as well as of pretextual motive, by White's.

With due deference to my learned colleagues, their conclusion is unsupportable in light of the entirety of the record proof, even when construed most favorably for the plaintiff, matched with the controlling legal pronouncements of the United States Supreme Court and long-standing Sixth Circuit precedent. An examination of the overall record and the existing legal precedent compels the inescapable conclusion that no rational, emotionally detached, and neutral jury could find in the plaintiff's favor, and therefore summary judgment for the defendant was mandatory. At bottom, the majority's decision is anchored not in the evidence and the law, but in dogma judicially legislated by the court majority. *Cf. Lochner v. New York*, 198 U.S. 45, 65 (1905) (Holmes, J., dissenting) (renouncing a result-oriented decision which was "decided upon an economic theory which a large part of the

country does not entertain" and further commenting that "whether [the dissenter] agreed with that theory" was irrelevant to the judicial obligation to enforce otherwise-valid legislation duly enacted by the people's elected representatives).

At all times material to this action, White's owned and operated several retail furniture outlets in the Columbus, Ohio vicinity.   On September 9, 1993, Gordon Schiffman ("Schiffman"), who was White's president, chief executive officer, and (together with his two sons) the controlling shareholder, hired Wexler to work as a sales representative at the predominantly family-owned company's Morse Road store.  On that date, Wexler was 55 years old, and Schiffman was approximately 64 years of age.[1]  As a floor salesman, Wexler received White's standard  compensation package, namely six percent commission on all delivered sales, with a guaranteed minimum annual salary of $20,000 (increased in 1996 to $25,000).   Any periodic salary payment which exceeded accrued commissions was distributed as a draw or advance against unearned future commissions.

Wexler's satisfactory performance on the sales floor, as well as his prior experience in the retail furniture industry, prompted Schiffman, on February 13, 1995, to promote the then-57-year-old Wexler to manager of the Morse Road store. Shortly thereafter, the plaintiff attended four extensive formal managerial training sessions, and subsequently benefitted from ongoing informal instruction by corporate supervisors. Based on his training and experience, Wexler understood that his duties as a store manager included, among other things, the counseling and supervision of subordinate personnel, the

---

[1]Wexler was born on January 9, 1938.   Schiffman's affidavit disclosed that he was 69 years old during January 1999, but it did not reveal his precise birth date.

The population segment protected by the ADEA encompasses persons aged forty or more.  29 U.S.C. § 631(a); *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1081 n.2 (6th Cir. 1994).

customer problems, taking care of all these salespeople's problems. . . ." (G. Schiffman).

3.   David Lively's references to Mr. Wexler's age, referring to him as an "old man" and a "grumpy old man."

4.   Mr. Lively told Mr. Wexler as he was demoted that White's was really going to be "grinding" their managers, making them do "stuff I don't think you'd want to be doing."

5.   The job was "getting to be tiring" for Mr. Wexler. (G. Schiffman).

6.   Gordon Schiffman's repeated references to John Neilson's youth when announcing Mr. Wexler's demotion.

Even if those six bits of evidence are construed most favorably for Wexler, they do not collectively support any rational inference of age-related bias, especially in the full context of the entire record evidence.  The proffered remarks by Schiffman and Lively[12] simply did not evince prejudice,

---

[12]The undisputed evidence reflected that Schiffman unilaterally decided to remove Wexler from intermediate management and restore him to his former sales position.  Accordingly, any statement by Lively has questionable relevance to this case.  *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 759-60 (6th Cir. 2000) (collecting Sixth Circuit decisions which mandated that only pertinent comments proximately made by company decision-makers may constitute evidence of discriminatory animus by the defendant).

However, even assuming *arguendo* that Lively had participated in the faulted employment decision, the cited statements attributed to him disclosed no age-related animus.  One of them (no. 4 above) did not reference age.  The other (no. 3) apparently referred to an unknown number of isolated innocuous remarks, patently made in jest, including one uttered during a conversation of unspecified date among Lively, Wexler, and a manufacturer's representative, which had no relationship to the demotion decision.  "[M]erely vague, ambiguous, or isolated

motivations for relieving him of his managerial responsibilities:[11]

1. "I'll just mention [as the reason for Wexler's demotion] that you're getting older." (Gordon Schiffman).

2. Mr. Wexler is told as he is demoted: "You're sixty years old, aren't you, Don? You don't need the aggravation, stress of management problems,

---

[11] It is noteworthy that the evidentiary record in the instant cause is entirely devoid of any evidence of an overall pattern of age-hostile remarks, or of a history of ageist employment decisions, by corporate decision-makers. *See, e.g., Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 252-54 (6th Cir. 1998); *Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 942-44 (6th Cir. 1987). To the contrary, *WEXLER CONCEDED THAT HE NEVER HEARD SCHIFFMAN MAKE ANY ANTI-ELDERLY COMMENTS, KNEW OF NO FELLOW WHITE'S EMPLOYEE WHO HAD EVER BEEN TREATED UNFAVORABLY BECAUSE OF AGE, AND KNEW THAT SCHIFFMAN'S PRACTICE HAD ALWAYS BEEN TO EMPLOY "GOOD PEOPLE" IRRESPECTIVE OF AGE.*

*WEXLER'S HIGHLY MATERIAL CONCESSIONS WERE CORROBORATED BY RECORD EVIDENCE THAT WHITE'S HAD AT ALL RELEVANT TIMES BEEN AN EXEMPLARY EMPLOYER OF PERSONS WITHIN THE AGE-PROTECTED CLASSIFICATION.* In January 1999, almost half of White's total work force (30 out of 64 employees) were *AGED 40 OR ABOVE. NINE OF THOSE WORKERS WERE OLDER THAN WEXLER. ONE WHITE'S STORE MANAGER HAD BEEN HIRED AT AGE 59. ANOTHER EMPLOYEE, HIRED AT AGE 69, HAD DECLINED SCHIFFMAN'S OFFER TO MANAGE ONE OF WHITE'S NEW RETAIL LOCATIONS. STILL ANOTHER WHITE'S EMPLOYEE CONTINUED WORKING UNTIL HIS VOLUNTARY RETIREMENT AT AGE 79.* Eight employee affiants, including five aged 40 or more, swore that they never witnessed any age discrimination against any employee during their employment with White's. *NO WITNESS, OTHER THAN WEXLER, TESTIFIED THAT HE OR SHE HAD EVER EXPERIENCED ANY AGE-RELATED MISTREATMENT BY WHITE'S; AND NO WITNESS, INCLUDING WEXLER, TESTIFIED THAT HE OR SHE HAD EVER OBSERVED OR OTHERWISE KNEW OF ANY AGE-DRIVEN DISCRIMINATION AGAINST ANY FELLOW WHITE'S EMPLOYEE.*

identification and correction of employee performance problems, and the replacement of malperforming or uncooperative sales representatives; as well as the creation of attractive furniture displays, the maintenance of the facility's overall appearance, the accurate recording of sales transactions, and the promotion of positive customer relations including the mailing of a "thank-you" note to each buyer. Most importantly, the plaintiff conceded at deposition that he knew that, as a store manager, *Schiffman would hold him personally accountable for his location's aggregate sales figures*.

Commencing in August 1996, *the overall sales volume of the Morse Road store, as well as Wexler's personal sales productivity, began a gradual decline*. That cash flow problem alarmingly deteriorated between November 1996 and May 1997, when *average monthly sales at Morse Road decreased 30.25%, and Wexler's personal sales declined 48%* (or about $200,000), compared to the corresponding seven-month interval during the prior twelve-month period. In response to that continuing downward spiral, the defendant adjusted Wexler's remuneration formula, starting on March 1, 1997, to partially reflect the overall performance of the Morse Road store. White's reduced Wexler's commission on his personal sales from six to three percent, but concurrently entitled him, for the first time, to a commission of one and one-half percent on all delivered sales transacted by his subordinate staff members.

On June 9, 1997, Wexler, Schiffman, and David Lively ("Lively"), who was White's Executive Vice-President and owner of five percent of the concern's shares, met to discuss the Morse Road location's chronically low performance. During that meeting, Schiffman expressed extreme dissatisfaction with the store's 24% decline in sales during the five-month period January through May 1997, and further expressed his disappointment with Wexler's deficiencies in his managerial performance, including consistently sloppy

paperwork,[2] failure to counsel underperforming sales representatives, and inadequate store maintenance.[3]

On June 15, 1997, Schiffman and Lively advised Wexler that the company planned to reassign him to his former position as a floor sales representative. The two corporate officers emphasized to Wexler that, although they were dissatisfied with his performance as a store manager,[4] they hoped that he would remain on White's sales staff. They expressed mutual confidence that he could contribute to the company in the future as a sales professional. In recognition of his loyalty, *the defendant offered Wexler the most generous compensation package ever bestowed upon one of its salesmen: Wexler's managerial compensation would continue through the balance of June 1997, and thereafter, he would accrue an **eight** percent commission on each of his personally consummated sales, rather than the standard six percent allotted to each of White's other salespersons. Moreover, the company agreed to forgive $4,500 in past*

---

[2]Wexler conceded that, throughout his tenure as a store manager, he had repeatedly been reprimanded for his failures to properly document transactions.

[3]Following the criticism of his performance as a store manager, Wexler drafted a six-page handwritten response, wherein he assigned blame for his managerial failures to other persons and/or external circumstances allegedly beyond his control. Wexler gave that statement to Schiffman on June 10, 1997.

Although generally self-serving, that document opened with a concession by Wexler that his management performance had been deficient and that White's had duly warned him of his shortcomings:

I, by no means purport that my management style is perfect. I have made mistakes &, as they have been brought to my attention, tried to correct them.

[4]Via affidavit, Schiffman attested that, "[a]lthough Wexler had several performance deficiencies, the primary reason for replacing him [as the store manager] was the dramatic falloff in the store's sales and his personal sales."

---

discriminatory motive."[10]  *Weberg*, 229 F.3d at 522 (*citing Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-45 (1989)).

Employment discrimination claims of the *Price Waterhouse* genre are often described as "mixed-motive" cases, because, in the typical action, the overall evidence ultimately reflects a mixture of legitimate and illegitimate reasons for the employer's assailed adverse employment action against the plaintiff. *Price Waterhouse*, 490 U.S. at 247. However, as unfolded below, in the cause *sub judice*, no *Price Waterhouse* mixed-motive analysis is warranted, because Wexler failed to surmount his initial burden of proffering probative direct evidence that *any* impermissible age-related discriminatory motive incited his ouster from management. *See id.* at 244-45 ("*once a plaintiff* in a Title VII case shows that gender [or age] *played a motivating part* in an employment decision, [*then*] the defendant may avoid a finding of liability only by proving that it would have made the same decision even if it had not allowed gender [or age] to play such a role." (Italics and brackets added; note omitted).

In the litigation *instanter*, Wexler, via his briefs, has offered four statements by Schiffman, and two by Lively, as his foundational *direct* proof of White's alleged age-animated

---

[10]This court has distinguished the defendant's burden of *disproving* intentional discrimination supported by the plaintiff's *direct* evidence, from the defendant's burden of *production* to rebut a sustainable *circumstantial* inference of intentional discrimination:

"[O]nce the district court accepts the plaintiff's *direct evidence*, the employer's asserted nondiscriminatory reason, which is merely a burden of production under the *McDonnell Douglas* [circumstantial evidence] framework [discussed *infra*], essentially becomes an *affirmative defense upon which the employer bears the burden of proof.*"

*Weberg v. Franks*, 229 F.3d 514, 522-23 (6th Cir. 2000) (emphases and brackets added) (paraphrasing *Terbovitz v. Fiscal Court of Adair Cty.*, 825 F.3d 111, 115 (6th Cir. 1987)).

are insufficient to support an inference of age discrimination." *Chappell v. GTE Products Corp.*, 803 F.2d 261, 268 (6th Cir. 1986) (citation omitted).

*"Direct evidence* [of employment discrimination] 'is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Weberg*, 229 F.3d at 522 (emphasis and brackets added) (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). "Such evidence would take the form, for example, of an employer telling an employee, 'I fired you because you are disabled [or elderly].'" *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998). If the plaintiff produces sufficient direct evidence of discrimination, "[t]he burden of persuasion then shifts to the defendant to show that it would have terminated the plaintiff's employment absent the

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986)). The Sixth Circuit has applied the edicts of *Reeves* to summary judgment cases. *See, e.g., Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 433-34 & n.4 (6th Cir. 2002); *Ross v. Campbell Soup Co.*, 237 F.3d 701, 708-09 (6th Cir. 2001). Accordingly, the general analysis and overall ruling of *Reeves*, evolved further below, control in age-discrimination summary judgment cases.

*salary advanced to Wexler as a draw against his as-yet-unearned commissions, despite its long-standing policy and practice of debiting such excess payments against the employee's unaccrued future commissions*. On the following day, June 16, 1997, Wexler accepted that generous offer, and continued working in that capacity without interruption at least until the date of oral argument before the initial panel on October 31, 2000.

As purported support for his allegation that Schiffman demoted him by reason of age-driven animus, Wexler testified that, near the start of the June 15, 1997 assembly:

Gordon [Schiffman] had a smile on his face, said he had read the paper that I had given him, and that most of what I had written was correct. However, they have decided to make a change.

He then said, you're 60 years old, aren't you, Don? I said, no, Gordon. I'm 59. I'll be 60 in January. He then said, well, we both have been in the business 117 years. You don't need the aggravation, stress of management problems, customer problems, taking care of all these salespeople's problems that keep calling you on the phone all day every day.

Mr. Lively then interjected that they were going to really be grinding their managers in the future, and if they had to sweep floors or stay there until 11:00 p.m., they would do so. And he said it was stuff that I don't think you'd want to be doing.

Wexler also testified that, immediately prior to the June 15 meeting, he had observed Schiffman and Lively speaking with a "young man." That person was John Neilson ("Neilson"), an individual in his early thirties.

As indicated, on June 16, 1997, Wexler accepted Schiffman's reassignment proposal and graduated commission offer. Schiffman responded that he was pleased by Wexler's decision to remain on White's employment

roster. Later that evening, Schiffman telephoned Wexler to clear with him the highlights of his planned announcement to the company staff regarding Wexler's departure from management. It was mutually agreed that, to avoid Wexler any embarrassment, Schiffman would "just mention that you're getting older, although not as old as I am."

Three days later, on June 19, 1997, Schiffman convened his employees to announce Wexler's decision to resume his former non-supervisory sales position. Wexler tape recorded that meeting. He has relied upon the following excerpt from Schiffman's oral address:

> I'm going to share with you a conversation that Don Wexler, David Lively and I started in January. Don came back to my office one day and said Gordon, I've been in my management [sic] for a bunch of years, and I'm not sure what I want to do. Maybe I should just be worrying about my own customer and not everyone else's customers. This is getting to be tiring.
>
> At that time we were interviewing for managers, because we needed somebody for this store. But we did interview another guy that we thought was top drawer. We thought that he was just absolutely a terrific kid. He's about David's age, been in the furniture business about as long as David. He's about as intense as David is. He's a fine guy. His name is John Nielson [sic].
>
> I think you will like him very much. He is a fine, proper young man. Don't be misled by his youth anymore than being misled by David Lively's youth.

Wexler *conceded* at deposition that Schiffman's June 19, 1997 presentation, during which he did not directly reference Wexler's age, was "*gracious.*"

As additional evidence of the defendant's purported age-animated bias, Wexler attested that David Lively once, on an unspecified date, had offered, "out of respect for [Wexler's] age," to retrieve a pen from the floor which Wexler had

following briefing, the district court granted that motion, ruling that the plaintiff's evidence failed to support his *prima facie* case; and further, even if he had proved the elements of a circumstantial discrimination claim, he had failed to refute, via proof of pretext, the defendant's tendered permissible motivation for reassigning him to salesperson status, namely its business judgment that the plaintiff was unfit for the managerial post, primarily because his store had experienced a long-term severe depression in its sales volume. The plaintiff's timely appeal followed.

A plaintiff may prove employment discrimination through *either* direct or circumstantial evidence of disparate treatment which had been driven by animus against a legally protected characteristic. *See, e.g., Weberg v. Franks*, 229 F.3d 514, 522-23 (6th Cir. 2000). "The direct evidence and circumstantial evidence paths are mutually exclusive; the plaintiff can meet [his] burden with either method of proof." *Id*. at 523 (brackets added; citation and note omitted). Nonetheless, irrespective of whether the plaintiff's proof of disparate treatment is direct or circumstantial, the ultimate liability question is the same – "'liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision.' That is, the plaintiff's age must have 'actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141 (2000) (brackets omitted; parentheses in original) (*quoting Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)).[9] "Mere personal beliefs, conjecture and speculation

---

exist such that reasonable minds would not differ," summary judgment or judgment as a matter of law should be awarded).

[9] The high Court in *Reeves* sustained a trial court's post-verdict denial of the defendant's Fed. R. Civ. P. 50 motion for judgment as a matter of law. Although *Reeves* was not a Fed. R. Civ. P. 56 summary judgment case, the Court remarked that Rule 50 and Rule 56 standards "mirror" each other, "such that 'the inquiry under each is the same.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (*quoting*

to be drawn in his favor." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986) (citation omitted). *See also Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 456 (1992); *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

All legal conclusions by lower courts are scrutinized *de novo. Grider v. Abramson*, 180 F.3d 739, 746 n.7 (6th Cir.), *cert. denied*, 120 S. Ct. 528 (1999); *Brennan v. Township of Northville*, 78 F.3d 1152, 1154, 1156 (6th Cir. 1996). Hence, a lower court's summary judgment award is subject to plenary review, because the sufficiency of the record evidence, construed most favorably for the opponent of summary judgment, poses a question of law. *See Doe v. Claiborne County*, 103 F.3d 495, 505 (6th Cir. 1996). The touchstone is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (*quoting Anderson*, 477 U.S. at 251-52).

*Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 556-57 n.7 (6th Cir. 2000) (ellipse in original).

It should be emphasized that courts are charged with the duty of awarding summary judgment for a defendant when "a fair-minded jury could [not] return a verdict for the plaintiff. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict – whether there is evidence upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Anderson*, 477 U.S. at 252 (italics in original; internal quotations and citation omitted; brackets added in part and omitted in part). The party opposing summary judgment must present "significant probative evidence," not "merely colorable" evidence, which is sufficient to create more than "some metaphysical doubt as to the material facts." *Moore v. Philips Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). "The summary judgment paradigm requires a court to draw and respect only reasonable inferences; a court need not regard that which is farfetched or fantastic." *Galey v. May Department Stores Co.*, 9 Fed. Appx. 295, 298 (6th Cir. March 15, 2001) (unpub'd *per curiam*). *See also Jackson v. Quanex Corp.*, 191 F.3d 647, 657 (6th Cir. 1999) (asserting that, when "there is a complete absence of pleading or proof on an issue material to the cause of action or when no disputed issues of fact

dropped; had on another undated occasion described the plaintiff to an outside manufacturer's representative as "a bearded, grumpy old man;" and had occasionally addressed him as "pops" or "old man."[5]  However, Wexler conceded that he, in turn, had occasionally referred to Lively as "the kid."

Furthermore, Wexler challenged the veracity of White's stated reason for his demotion, namely significant long-term negative trends in sales at the Morse Road location, by offering his own testimony, together with affidavits from several co-workers, which attributed the sharp slump in sales figures primarily to factors extraneous to Wexler's mismanagement. According to the plaintiff, the major causes of his store's flagging profitability were a "soft market" in retail furniture, a reduction in company advertising featuring the Morse Road store in deference to concentration upon promotion of two recently opened White's outlets, and the assignment of an excessive number of inexperienced trainees

---

[5] The circuit majority has characterized those isolated, vague, and facially innocuous remarks by Lively, as well as Schiffman's June 19, 1997 public comments about Wexler, as "pejorative" and as betraying "stigmatizing beliefs." Plainly stated, it is difficult to understand how those remarks could be deemed to reflect disparagement of Wexler's skills as a sales manager animated by biased stereotypic assumptions about older persons. Indeed, in imputing, to Lively and Schiffman, ageist bias in their employment judgments, irrespective of the complete absence of probative evidence that ageist prejudice influenced their decisions regarding Wexler to any degree, the court majority has engaged in the same factually unsupported hypothesizing of which it has accused the plaintiff's superiors – it has assumed that any person who recognizes the fact of another's age in any context or for any reason, including the common sense understanding that the objectively-measurable declining performance of a formerly productive worker may be attributable to some extent to that employee's advancing years, is the type of person who embraces overall negative stereotypical opinions of the elderly and consequently makes wrong-headed employment decisions driven by irrational prejudices. While that doctrinaire syllogism may be considered tautological in certain ideological circles, it does not constitute probative evidence upon which a properly-instructed rational jury could find compensable employment discrimination under federal law.

to Wexler's store who would later be re-deployed at the two new locations.

Additionally, the plaintiff's evidence, including co-worker affidavits and his own self-serving attestations, lauded selected aspects of his managerial performance. The plaintiff and his witnesses generally asserted that the plaintiff had made some efforts to train and counsel his subordinates, to improve enforcement of store cleanliness and maintenance standards, to ensure the prompt completion of merchandise deliveries and the mailing of follow-up "thank you" notes, to elevate sagging worker morale, and to reduce the incidents of recordkeeping errors. The plaintiff's witnesses praised him for his purported hard work and managerial professionalism.

Finally, Wexler has contended that his immediate successor, John Neilson, performed even less effectively than he had as the Morse Road store manager, and exhibited comparatively inferior managerial prowess. Store revenues continued to decline during Neilson's administration. However, White's *terminated* Neilson's employment approximately five months after hiring him as the Morse Road store manager, in the face of continually decreasing revenues, which was the same reason that it had earlier permitted Wexler to resume his position as a salesperson. It bears emphasis that, unlike Wexler, Neilson was *not* re-assigned within the company organization.[6]

---

[6]It should be noted that the recitation of the record evidence contained in the majority opinion does not merely reflect the totality of the facts as construed most favorably for the plaintiff as the opponent of summary judgment, but instead constitutes an exclusive summary of *only* the evidence which favors the plaintiff's case. It improperly ignores, completely, all uncontested material proof which favors the defendant, or which can be rationally construed only in a manner which favors the defendant. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (commenting that, in disposing of a summary judgment motion, a court "must review the record '*taken as a whole,*'" which means "all of the evidence in the record." (emphasis added) (*quoting Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 242, 250-51 (1986)); *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1290 (D.C. Cir.

On April 9, 1998, Wexler instituted his one-count complaint against White's in federal district court, by which he alleged that his demotion from store manager to floor salesman constituted age discrimination in employment.[7] After discovery, the defendant moved for summary judgment.[8] *See* Fed. R. Civ. P. 56. On July 15, 1999,

---

1998) (instructing that, when reviewing a summary judgment, "the court must consider *all the evidence in its full context* in deciding whether the plaintiff has met his burden of showing that a reasonable jury could conclude that he had suffered discrimination and accordingly summary judgment is inappropriate.") (emphases added).

[7]The Age Discrimination in Employment Act commands, in material part:

It shall be unlawful for an employer –

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age[.]

29 U.S.C. § 623(a).

[8]"The [summary] judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (brackets added).

The familiar standards governing summary judgments have been articulated by this court as follows:

A court may grant summary judgment under Fed. R. Civ. P. 56 only if, after construing the record evidence, and the reasonable inferences which may be drawn therefrom, most favorably for the party opposing the motion, the proof could not support a judgment in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are