**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0583n.06

No. 10-1074

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Aug 18, 2011*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| EFEOSA IDEMUDIA, | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF MICHIGAN |
| J.P. MORGAN CHASE, a | ) | |
| corporation; MICHAEL BAERS, an | ) | |
| individual, | ) | **O P I N I O N** |
| | ) | |
| **Defendants-Appellees.** | ) | |
| | ) | |

Before: SUHRHEINRICH, MOORE, and COOK, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** Plaintiff-Appellant Efeosa Idemudia appeals the district court's grant of summary judgment to Defendants-Appellees J.P. Morgan Chase Bank, N.A. ("Chase") and Michael Baers (together, "Defendants"), on his claim of race and national-origin discrimination brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"). Because Idemudia has not presented evidence sufficient to raise a genuine issue of material fact with respect to whether Defendants' legitimate, nondiscriminatory reasons for terminating him are pretext for discrimination, we **AFFIRM** the district court's grant of summary judgment.

## I.  FACTS & BACKGROUND

Idemudia is an African American who was born in Nigeria.  He started working for Chase in 1996 as a bank teller in New York City.  While working for Chase in New York, Idemudia was promoted to several different teller positions and then to the position of a personal banker.  In November 2006, he was promoted to branch manager for a new branch that opened in Kalamazoo, Michigan in April 2007.  Also in April 2007, Baers, who is white, became the District Manager overseeing Idemudia's branch.

On May 2, 2007, Chase Field Operations Service Coach John Tinay conducted a routine audit visit to assess coaching needs; he provided feedback and rated the branch as "Needs Work."  R.52 Ex. 32 (Record of Branch Visit).  Idemudia testified that Tinay worked with the branch's assistant branch manager ("ABM") Robert Byrd during this training visit and that the only issue that Tinay discussed with Idemudia was communications issues between Idemudia and Byrd.

On May 16, 2007, personal banker Malisa Gries brought her children to the bank, and the children pulled the fire alarm.  The bank was charged $500 for causing the police department to respond.  Idemudia was not at the bank on May 16, 17, or 18, because his wife was in the hospital delivering their son, and the bank was under the management of ABM Byrd during this time.  Also on May 16, Byrd instructed Gries to lock customer deposits in a teller station, which was against Chase's policy and procedure. On June 1, 2007, Chase Global Security and Investigations conducted an investigation of what happened on May 16.  Idemudia first stated that he found the missing deposits on Saturday, May 19, but, upon reviewing the branch's video recording, he stated that he

and Gries found the deposits on Monday, May 21. Idemudia testified in his deposition that he was confused about the dates because he came into the branch on Saturday even though he was not supposed to work that day. One report resulting from the investigation indicated that both Byrd and Idemudia would be suspended. One of the investigators, Ron Philpot, who is African American, recommended that Idemudia be terminated for the incident because he believed that Idemudia lied about the customer deposits. Byrd was terminated, but Baers decided not to terminate Idemudia. Instead, Idemudia was placed on suspension until June 5, 2007. On June 7, 2007, Idemudia was issued a written warning, which listed numerous concerns with Idemudia's management of the branch. Idemudia alleges that Baers added the loss amount on the warning after Idemudia signed it. *Compare* R.52 Ex. 25 (written warning with loss amount), *with id.* Ex. 50 (written warning without loss amount). He also alleges that he was given a warning by Baers with Baers's manager Dan Dubeau present but that Baers switched the documents and gave him a *final* written warning without Dubeau present. After Byrd was terminated, Baers did not hire a replacement ABM during the two-month period that Idemudia remained at the bank.

On June 25, 2007, Tinay conducted another audit visit, again providing feedback and rating the branch as "Needs Work." R.49 Ex. 11 (Record of Branch Visit). Idemudia testified that although the branch did not have an ABM at the time of Tinay's second visit, Idemudia did not speak with Tinay about the results of the visit. Baers also met with Idemudia on June 25, 2007, to develop a "Branch Action Plan." On June 26, 2007, Chase trainer Serena Ketterer conducted a branch visit and prepared a report based on her visit. The report noted positive observations from the visit,

including that the branch had no "loss account warehouse" ("LAW") losses.[1]  The report also

indicated areas for improvement, including that Idemudia was "having trouble scheduling the branch

effectively" and that Idemudia had "committed" to taking certain online training courses.  R.52 Ex.

41 (Branch Visit Report at 2–3).  Ketterer worked directly with Idemudia during this visit, and

Idemudia received by email a copy of her report, which she prepared after her visit.  Baers met with

Idemudia again on July 2, 2007 and July 3, 2007, to discuss branch action plans.  During Baers's

visit on July 3, 2007, Baers showed Idemudia examples of other branch action plans, and Idemudia

laughed at them and said they were "ridiculous."  R.49 Ex.14 (Baers documentation at 4); R.49 Ex.

25 (July 21, 2009 Idemudia Dep. at 199).

On July 24, 2007, Idemudia spoke with personal banker Dawn Lyons-Dean regarding an

inappropriate comment that she made to a customer.  Lyons-Dean then left the branch when she was

supposed to be working.  Idemudia prepared a formal written disciplinary action against Lyons-Dean

for insubordination and, on July 25, 2007, recommended that she be terminated.  Idemudia had had

several prior interactions with Lyons-Dean, resulting in written statements.  Idemudia also alleged

that Lyons-Dean once commented that she always had been told she would have a supervisor with

"blue eyes, slick hair" and that another time she responded to a statement that Idemudia made about

getting along with his neighbors, who were white, by stating it was "because you're African, if you

---

[1] A Chase report indicates that "LAW" losses are "[a]ccount related losses that do not include other losses charged to the branch, i.e. such as teller differences."  R.52 Ex. 26 (LAW report). Idemudia describes "LAW" losses as "losses that are avoidable, but because the employee didn't follow policies and procedures, it resulted in a loss."  R.49 Ex. 25 (July 21, 2009 Idemudia Dep. at 220).

were African American, that wouldn't happen." R.49 Ex. 23 (July 2, 2009 Idemudia Dep. at 109–10). Baers did not accept Idemudia's recommendation and did not terminate Lyons-Dean. Baers stated that he did not terminate her because Idemudia did not follow proper procedure with respect to the writeups and because he had "reason to believe that [Idemudia was] not managing [Lyons-Dean] properly." R.49 Ex. 24 (Baers Dep. at 30).

At some point before Idemudia was terminated, Baers asked Idemudia to interview for a personal banker position available in Stevensville, Michigan. The base pay for the position is less than Idemudia made as branch manager, and the branch is over forty-five minutes from Idemudia's residence. Idemudia alleges that Baers threatened that he would write up Idemudia if Idemudia did not interview. Idemudia also alleges that, in the same conversation that Baers told Idemudia to apply for the personal banker position, Baers also told Idemudia that Baers had dated an African American woman for three years and that she had broken up with him because her family did not approve of him being white.

On August 1, 2007, Baers came to the branch and asked if Idemudia had completed the training that Tinay and Ketterer had recommended after their branch visits. Idemudia responded that he had, but when Baers asked Idemudia to pull up the training on the computer, Idemudia admitted that he had not completed the training. Idemudia admitted in his deposition that he lied to Baers about completing the training. When asked why he had lied about the training that Baers requested him to take, Idemudia responded that the training "was a nuisance" and that "[i]t is like having a fly

5

buzzing by your ear, you have to swat the fly off and say just leave me alone." R.49 Ex. 25 (July 21, 2009 Idemudia Dep. at 108).

Baers gave Idemudia the option to resign or to be terminated. Idemudia testified that he said he would let Baers know his choice and expressly denies that he told Baers that he would resign. Idemudia was replaced by a white woman who was initially hired as a branch manager for a branch that Chase was considering opening in the Battle Creek area but that never in fact opened.

## II. PROCEDURAL HISTORY

Idemudia filed a charge of discrimination with the Michigan Department of Civil Rights on February 22, 2008. After receiving a right-to-sue letter from the U.S. Equal Employment Opportunity Commission ("EEOC"), Idemudia filed a complaint against Defendants in Michigan state court alleging one count of race and national origin discrimination under Title VII, the ELCRA, and § 1981. Defendants[2] removed the case to the United States District Court for the Western District of Michigan pursuant to 28 U.S.C. §§ 1441, 1446. After discovery, Defendants filed a motion for summary judgment. At a hearing on the motion, the district court orally announced its

---

[2]Chase filed the Notice of Removal, which does not name Baers as joining in the removal. Even if the failure to name Baers in the Notice of Removal is a procedural defect pursuant to the "rule of unanimity," which requires all properly served or joined defendants to join in the removal or to file a written consent to the removal, *but see Harper v. AutoAlliance Int'l, Inc.*, 392 F.3d 195, 201–02 (6th Cir. 2004) (suggesting that technical deficiency in notice of removal can be cured by subsequent filings indicating consent to removal), Idemudia waived any challenge to this potential procedural defect by failing to file a motion to remand within thirty days of removal. *Loftis v. United Parcel Serv., Inc.*, 342 F.3d 509, 516–17 (6th Cir. 2003) (citing 28 U.S.C. § 1447(c); *Page v. City of Southfield*, 45 F.3d 128, 133–34 (6th Cir. 1995)).

decision granting Defendants' motion. The district court subsequently entered judgment dismissing the case, and Idemudia timely appealed.

### III. ANALYSIS

#### A. Standard of Review

"We review the district court's grant of summary judgment de novo." *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 433 (6th Cir. 2009). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Additionally, we must view all facts and inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

#### B. Race and National-Origin Discrimination Claim

Idemudia claims that he was terminated because of his race and national origin.[3] Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against individuals "with respect to his compensation, terms, conditions, or privileges of employment" because of race or national origin. 42 U.S.C. § 2000e-2(a)(1). Similarly, Michigan's ELCRA prohibits employers from discriminating against individuals "with respect to employment, compensation, or a term, condition,

---

[3]Defendants argue that Idemudia did not exhaust his administrative remedies with respect to his claim of national-origin discrimination because he did not identify national origin as a basis on his charge of discrimination. Because exhaustion of administrative remedies is not a jurisdictional prerequisite, *Mitchell v. Chapman*, 343 F.3d 811, 819–20 (6th Cir. 2003), *cert. denied*, 542 U.S. 937 (2004), and because we agree on the merits with the district court's decision to grant summary judgment, we need not address this argument.

or privilege of employment" because of race or national origin. MICH. COMP. LAWS § 37.2202(1)(a).

Section 1981 guarantees that "[a]ll persons within the jurisdiction of the United States shall have the

same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white

citizens." 42 U.S.C. § 1981(a). We review claims of discrimination brought under the ELCRA and

§ 1981 under the same standards as claims brought under Title VII. *White v. Baxter Healthcare

Corp.*, 533 F.3d 381, 391 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 2380 (2009); *Sutherland v. Mich.

Dep't of Treasury*, 344 F.3d 603, 614 n.4 (6th Cir. 2003).

### 1. Direct Evidence

Idemudia's arguments to the district court and on appeal rely on the burden-shifting

framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973), for claims involving circumstantial evidence of discrimination. Nonetheless, within his

analysis of the three-step *McDonnell Douglas* framework, Idemudia asserts that Baers's statement

that Baers once dated an African American woman but that she broke up with him because he is

white is direct evidence of discrimination. The district court stated that Idemudia did not raise a

claim using direct evidence and that there was "no [direct] evidence in any event," and proceeded

to analyze the case, as the parties presented it, under the *McDonnell Douglas* framework. R.66 (Hr'g

Tr. at 44). Defendants argue on appeal that Idemudia failed to raise a direct-evidence argument in

the district court and that Baers's statement was not "a negative reference to Idemudia's race and

national origin" and "proves nothing negative concerning Baers." Appellee Br. at 20.

Idemudia raised the direct-evidence argument to the district court in the same manner as he does on appeal, and we agree with the district court that he has failed to develop adequately a claim using the direct-evidence method of proof. *See United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." (alteration omitted) (internal quotation marks omitted)); *see also DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004) (explaining the framework when plaintiffs presents direct evidence, which differs from the *McDonnell Douglas* framework used when plaintiffs present indirect evidence).

Even if we were to consider Idemudia's argument, it is without merit because Baers's statement does not constitute direct evidence of discriminatory intent. "Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *DiCarlo*, 358 F.3d at 415 (alteration omitted) (internal quotation marks omitted). "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Id.* (internal quotation marks omitted).

Baers's statement itself is not discriminatory or negative towards Idemudia's race or national origin. *Cf. id.* at 415–16 (supervisor called employee a "dirty wop"). However, "[a]lthough it is true the disputed [statement] will not always be evidence of racial animus, it does not follow that the

term, standing alone, is always benign. The speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006). That Baers made the statement in the same conversation that he allegedly threatened Idemudia about the personal-banker interview suggests that the statement was intended to express that Baers holds racial animus as a result of the experience with his girlfriend. Idemudia perceived the statement in this manner. On the other hand, Baers made the statement regarding his ex-girlfriend in response to a statement by Idemudia that he did not want to go to the Stevensville branch because he did not "want to go to a place where [he would] stick out like a sore thumb, be like the only black man in a 100 mile radius." R.49 Ex. 23 (July 2, 2009 Idemudia Dep. at 97–98). Baers responded that he "experienced that" and then proceeded to tell Idemudia about his ex-girlfriend. *Id.* at 98. When considered in this context, a factfinder could draw the inference that Baers simply intended to show understanding in response to Idemudia's expressed concern. Different inferences could be drawn, and thus Baers's statement does not "require[] the conclusion" that Baers was motivated by prejudice. *See DiCarlo*, 358 F.3d at 415.

### 2. Indirect Evidence

To prove intentional discrimination using indirect or circumstantial evidence, Idemudia must use the burden-shifting framework set forth in *McDonnell Douglas* and modified in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981).[4] *See White*, 533 F.3d

---

[4]Idemudia does not allege a mixed-motive claim pursuant to 42 U.S.C. § 2000e-2(m). *See White*, 533 F.3d at 396–402 (rejecting application of the *McDonnell Douglas/Burdine* framework for single-motive claims to mixed-motive claims).

at 391; *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006). First, "the plaintiff bears the initial 'not onerous' burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence." *White*, 533 F.3d at 391 (quoting *Burdine*, 450 U.S. at 253). Once the plaintiff establishes a prima facie case, there is a presumption of discrimination, and the burden shifts to the defendant to rebut the presumption by providing evidence of a "legitimate, nondiscriminatory reason" for the action taken. *Burdine*, 450 U.S. at 253–54 (internal quotation marks omitted). If the defendant satisfies this burden with a legally sufficient explanation, the burden shifts back to the plaintiff to show that the defendant's proffered reasons "were not its true reasons, but were a pretext for discrimination." *Id.* at 253. "Throughout this burden-shifting approach, the plaintiff continues to bear the ultimate burden of proving, by a preponderance of the evidence, the intent to discriminate." *Wright*, 455 F.3d at 707.

### a. Prima Facie Case of Discrimination

To demonstrate a prima facie case of discrimination, the "plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees."[5] *White*, 533 F.3d at 391. It is

---

[5]The fourth prong of the prima facie case for proving discrimination under the ELCRA requires the plaintiff to show that he "was discharged under circumstances that give rise to an inference of unlawful discrimination," *Lytle v. Malady*, 579 N.W.2d 906, 914 (Mich. 1998), but the Michigan Supreme Court also has stated that its prima facie case "is an adaptation of the United States Supreme Court's *McDonnell Douglas* test" for discrimination claims brought under Title VII. *Id.* at 914 n.19; *accord Lind v. City of Battle Creek*, 681 N.W.2d 334, 338 (Mich. 2004) (confirming that the *McDonnell Douglas* test for a prima facie case applies to claims brought pursuant to the

undisputed that Idemudia can meet the first and third elements: he is African American and he was terminated. In their motion for summary judgment, Defendants alleged that Idemudia could not satisfy the second and fourth elements of the prima facie case. The district court assumed for purposes of its analysis that Idemudia had demonstrated a prima facie case and proceeded to decide the case under the analysis of whether Defendants' reasons for terminating Idemudia were legitimate, nondiscriminatory reasons, and, finding that they were, whether the reasons were pretext for discrimination.

We conclude that Idemudia has satisfied the second and fourth elements of the prima facie case. When considering the second element of the prima facie case, we "focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003) (en banc). "[A] court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case. To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination." *Id.* at 574. Idemudia had worked at Chase for eleven years and "was an above average [personal banker]" in a branch in New York City, which "is why he was selected to" the branch manager position in Michigan. R.55 Ex. A (Performance Review at 1). Chase does not dispute that Idemudia's branch produced "good numbers." R.49 Ex. 24 (Baers Dep. at 44–47, 58). Thus, Idemudia has demonstrated that he was objectively qualified for the

---

ELCRA); *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 521 (Mich. 2001) (same).

position, and Defendants' more subjective reasons for terminating Idemudia for his inability to manage should not be considered at the prima facie stage. Idemudia also satisfied the fourth element of the prima facie case because he was replaced by a white female.

Because Idemudia has established a prima facie case, there is a presumption of discrimination, and the burden shifts to Defendants to rebut the presumption with a legitimate, nondiscriminatory reason for terminating Idemudia.

### b. Legitimate, Nondiscriminatory Reason

Defendants claim that Idemudia was terminated because of his inability to manage the branch. Specifically, the Recommendation for Termination that Baers sent to Chase management states that he recommended terminating Idemudia "because of unsatisfactory performance, lack of leadership ability, poor management of the branch, operations issues, [and] failure to follow policy and procedure." R.52 Ex. 17 (Rec. for Termination); *accord* R.49 Ex. 22 (EEOC Letter at 2) ("[Defendants] provided information that the decision to terminate your employment was not based on the revenue generated by the branch during the first months after it opened. It was based on your lack of leadership ability, poor management of the branch, operations issues, and failure to follow policy and procedures which created unacceptable risk for the branch."). Although the five reasons listed on the Recommendation for Termination are very general, the document further states that Idemudia "was given a written warning regarding these issues on June 7, 2007 along with several follow up meetings discussing his lack of progress during June and July of 2007." R.52 Ex. 17 (Rec. for Termination); *see* R.52 Ex. 25 (Written Warning) (listing "concerns regarding [Idemudia's]

13

leadership as a branch manager"); R.49 Ex.14 (Baers documentation).  The written warning and Baers's documentation of the meetings that he had with Idemudia provide detail regarding the issues and events that Defendants claim support their decision to terminate Idemudia.  Therefore, we believe that the Defendants' proffered reasons for terminating Idemudia are sufficiently "'clear and reasonably specific'" and are "supported by 'admissible evidence which would allow the trier of fact rationally to conclude that the employment decision [was] not motivated by discriminatory animus.'" *White*, 533 F.3d at 392 (alteration in original) (quoting *Burdine*, 450 U.S. at 257–58).

The proffered reasons thus constitute a legally sufficient explanation to rebut the presumption of discrimination.  Furthermore, Idemudia does not dispute that Defendants have put forth a legitimate, nondiscriminatory reason.  *See* Appellant Br. at 21–46 (arguing that Defendants' legitimate, nondiscriminatory reasons were pretext); Reply Br. at 6–7.

### c. Pretext

The district court's decision to grant summary judgment in favor of Defendants was based on its analysis of the final, pretext stage of the *McDonnell Douglas/Burdine* framework.  The district court stated that there was "[r]epeated evidence that [Idemudia] was not functioning in a way that a manager would function" and that its "overwhelming review of the record suggests that the defense actually went out of its way . . . to attempt to keep Mr. Idemudia with the organization in one capacity or another and not that it was working to remove him from the organization."  R.66 (Hr'g Tr. at 48, 53).  The district court concluded that "the record is really beyond genuine dispute and beyond reasonable dispute that he was unsuccessful as a branch manager."  *Id.* at 55.

To meet his burden of showing pretext, Idemudia "must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Warfield v. Lebanon Corr. Inst.*, 181 F.3d 723, 730 (6th Cir. 1999) (internal quotation marks omitted). More specifically, we have stated,

> Pretext may be established "either directly by persuading the trier of fact that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action. *See Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008) (citing *Manzer* [*v. Diamond Shamrock Chems. Co.*], 29 F.3d [1078,] 1084 [(6th Cir. 1994), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, --- U.S. ---, 129 S. Ct. 2343 (2009)]).

*White*, 533 F.3d at 392–93 (alteration omitted). These three interrelated ways in which a plaintiff *usually* demonstrates pretext, however, are not formal requirements; rather, many "form[s] of circumstantial evidence [can be] probative of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000); *accord Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). For example, "the plaintiff may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision 'to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation.'" *White*, 533 F.3d at 393 (quoting *Wexler*, 317 F.3d at 578). We "ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is." *Chen*, 580 F.3d at 400 n.4. We ultimately must decide whether the plaintiff's evidence of pretext, combined with the evidence establishing the plaintiff's prima facie case, would "permit

15

the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 147–48; *accord Hazle*, 628 N.W.2d at 522 ("[A] plaintiff must not merely raise a triable issue that the employer's proffered reason was pretextual, but that it was a pretext for unlawful discrimination." (alteration omitted) (internal quotation marks omitted)).

Idemudia argues that he has cast doubt on Defendants' explanation with a variety of circumstantial evidence, including evidence that Baers made racially motivated remarks to him, that most of the reasons in the June 7 written warning were no longer a concern by the time he was terminated, that Defendants' reasons were contradictory and double standards, and that Baers created unreasonable expectations for him and no other branch managers. Idemudia also relies heavily on his branch's sales production to impugn Defendants' explanation that Idemudia was terminated because of his inability to manage the branch.

We agree with Idemudia that the district court did not take into account the evidence that Baers told Idemudia about a former African American girlfriend who broke up with him. This statement by the manager responsible for supervising and, later, terminating Idemudia, although not direct evidence of discrimination, is circumstantial evidence of discriminatory intent. *Cf. Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 392–93 (6th Cir. 2009) (discussing how discriminatory remarks and evidence of a discriminatory atmosphere can be evidence of pretext); *Vincent v. Brewer Co.*, 514 F.3d 489, 498 (6th Cir. 2007) ("This court has held that discriminatory remarks may serve as evidence of pretext because they indicate the presence of animus toward a protected group."). Further, the statement was made in the same conversation in which Baers allegedly required

16

Idemudia to interview for a personal banker position in another branch forty-five minutes away. We disagree with the district court's view that Baers's act to arrange the interview necessarily supports a finding of no pretext. Requiring Idemudia to go back to the position of a personal banker after being promoted to branch manager is likely an adverse employment action, *see Schram v. Schwan's Sales Enters., Inc.*, 124 F. App'x 380, 385–86 (6th Cir. 2005) (unpublished decision), and is discriminatory if the demotion was because of Idemudia's race. The district court's view that Baers was "trying to save a position for him at the bank" is one inference that could be drawn from the facts, R.66 (Hr'g Tr. at 52), but, in the light most favorable to Idemudia, the inference could be drawn that Baers was trying to demote Idemudia.[6] Idemudia also presented evidence that Dean-Lyons, the employee whom he recommended for termination, had made racially motivated remarks to him. *See Risch*, 581 F.3d at 393 ("We have held that discriminatory remarks, even by a nondecisionmaker, can serve as probative evidence of pretext.").

---

[6]At oral argument, counsel for Defendants argued that, under the "same-actor" principle, the fact that Baers did not follow Philpot's recommendation to terminate Idemudia after the May 16 incident creates a strong presumption that Baers was not discriminating against Idemudia two months later when terminating him. *See Wexler*, 317 F.3d at 572 ("[T]he same-actor inference . . . allows one to infer a lack of discrimination from the fact that the same individual both hired and fired the employee." (internal quotation marks omitted)). Even assuming that the same-actor principle would be applicable here, we have held that the same-actor inference "is insufficient to warrant summary judgment for the defendant if the employee has otherwise raised a genuine issue of material fact." *Id.* at 573–74 (en banc). Defendants also highlight the fact that Baers received approval for Idemudia's termination from Dubeau's boss Tony Glover who is an African American; however, the Supreme Court has "rejected any conclusive presumption that an employer will not discriminate against members of his own race." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998); *accord Wexler*, 317 F.3d at 574.

17

We nevertheless conclude that Idemudia has not presented circumstantial evidence of pretext that, when considered with the evidence supporting his prima facie case, would allow the trier of fact to infer intentional discrimination. We recognize at the outset that decisions made on the basis of subjective criteria, such as whether an employee is an effective manager, can "'provide a ready mechanism for discrimination,'" and thus such decisions are "'carefully scrutinized.'" *Scott v. Eastman Chem. Co.*, 275 F. App'x 466, 476 (6th Cir. 2008) (unpublished decision) (quoting *Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc.*, 690 F.2d 88, 93 (6th Cir. 1982)). Moreover, Defendants' "business judgment" regarding Idemudia's ability to manage "is not an absolute defense to unlawful discrimination." *Wexler*, 317 F.3d at 576. "[T]he reasonableness of [the] decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *Id.* However, Defendants supported their more general, subjective explanation[7] with specific examples of management tasks that Idemudia was told to complete but did not. Defendants state that Idemudia was asked to modify his staff schedule, complete certain online training courses, and develop branch actions plans with Baers.

---

[7]Of the five general reasons stated on Idemudia's Recommendation for Termination, Idemudia does present evidence that he followed correct policy and procedure with respect to recommending the termination of Lyons-Dean. In his deposition, Baers responded "Yes" when asked, "How many policies and procedures does Chase have? Did I not follow all of them?" R.49 Ex. 24 (Baers Dep. at 72). When a defendant presents multiple legitimate, nondiscriminatory reasons for the employment action, however, the plaintiff must demonstrate that each independently sufficient reason is a pretext for illegal discrimination. *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998).

Idemudia has not demonstrated a genuine issue of material fact with respect to the credibility of Defendants' reliance on these unperformed management tasks.

With respect to scheduling, Idemudia points to the statement of a Chase investigator involved in the May 16 incident that Gries "will not be a closer going forward," R.52 Ex. 34 (Email from Diane Koltunchik at 2), as evidence regarding the reasonableness of Baers's criticism of Idemudia's scheduling. But the record shows that whether Gries should be scheduled to close was not the only scheduling problem. The June 7 written warning stated that Idemudia was expected to "[r]eview staff scheduling with [Baers] and make/communicate changes to [the branch] team" and that "[c]hanges should be responsive to business needs and ensure equity." R.52 Ex. 25 (Written Warning at 2). Ketterer also provided Idemudia with instruction on scheduling. R.49 Ex.12 (Branch Visit Report at 2). Idemudia, however, continued to utilize a fixed time schedule despite Defendants' request that he not. With respect to the online training that Idemudia did not complete,[8] he argues that it was not mandatory in the sense that Baers did not tell him that he would be terminated unless he completed it. But Idemudia does not dispute that Baers told him to complete the training. Additionally, Ketterer's report indicates that Idemudia "committed that he [would] take [certain listed] on-line courses" and lists additional courses that Ketterer noted she "would recommend" that he take. R.49 Ex.12 (Branch Visit Report at 3). Idemudia did not complete the training and testified that the training "was a nuisance" and that "[i]t is like having a fly buzzing by

---

[8]Idemudia also admitted that he lied to Baers about whether he completed the training on the day that Baers terminated him. Defendants, however, do not rely on the fact that Idemudia lied as a reason for terminating him.

19

your ear, you have to swat the fly off and say just leave me alone." R.49 Ex. 25 (July 21, 2009

Idemudia Dep. at 108).

Idemudia argues that he did not have time to schedule and to complete the training, and that

these expectations were unreasonable given that he did not have a full-time ABM. Idemudia

dismisses the fact that Baers sent him an ABM from another branch to help out, alleging that the

ABM came in whenever she wanted and she did not report to him. Yet, Idemudia also stated that

he did not take the time to speak with Baers about the ABM that he saw on his time sheets because

he "needed a hundred percent focus on [his sales] numbers" and he "couldn't afford to be

distracted." R.49 Ex. 25 (July 21, 2009 Idemudia Dep. at 214–16).

With respect to the branch action plans, the June 7 written warning states that Idemudia was

expected to, with Baers, "develop a branch action plan that provides specific expectations for

coaching the staff on [certain sales] behaviors." R.52 Ex. 25 (Written Warning at 2). Idemudia

admits that when Baers visited the branch on July 3, 2007, and showed Idemudia examples of other

branch action plans, Idemudia laughed at them and said they were "ridiculous." R.49 Ex.14 (Baers

documentation at 4); R.25 (July 21, 2009 Idemudia Dep. at 199). Idemudia also stated,

> [Baers] was trying to do some action plan. . . . [H]e showed me his action plan but
> based on the results of my branch, he should be looking at my action plan and saying,
> how do you do this, but meanwhile he's showing me all this other stuff and I'm
> going, those branches you're showing me didn't make the goal, I blew them away.
> The goal—I made a hundred forty-one percent of the goal and yet you're showing me
> all these branches that two campaigns in a row did not make it, yet you want me to
> change my style of management to their style when they should be changing their
> style to mine. I didn't understand why he – So that's why I said, this guy is just not
> being fair. I mean, my branch is producing numbers, my branch is clean and yet he's
> forcing me to manage the way other branch managers manage.

R.49 Ex. 23 (July 2, 2009 Idemudia Dep. at 103–04).

Idemudia argues that Baers created these tasks for him and no other branch managers. Idemudia specifically points to the online training as something that Baers did not require of other branch managers. He also argues that, although Chase advises district managers to "use the numbers" to help branch managers build action plans, Baers admits that he did not "use the numbers" to help Idemudia. R.49 Ex. 24 (Baers Dep. at 80). Even assuming that Baers treated Idemudia different than other branch managers with respect to scheduling, training, and building action plans,[9] Idemudia has not demonstrated that the other branch managers were also having similar or other problems in their branches. Idemudia has provided no evidence that other branch managers received similar feedback from Chase audits or branch visits or were experiencing similar problems, and yet were not requested to modify their schedule, take online training, or work with Baers to develop a different action plan. The evidence regarding the tasks that Idemudia was asked to complete does not suggest that Defendants' requests were pretexts for discrimination.

As noted above, Defendants do not dispute that Idemudia's branch was highly successful in its sales production. R.49 Ex. 24 (Baers Dep. at 44–47, 58). However, Defendants produced evidence to support their explanation that they asked Idemudia to perform certain management tasks that he did not complete. We do not believe that the evidence in the record, with the inferences drawn in favor of Idemudia, calls into question Defendants' requests of Idemudia or their subsequent

---

[9]Baers testified, and Idemudia does not dispute, that the training was recommended by Tinay and Ketterer. R.49 Ex. 24 (Baers Dep. at 77). Ketterer also instructed Idemudia on scheduling. R.49 Ex.12 (Branch Visit Report at 2).

decision to terminate Idemudia for failing to complete the tasks as pretext for intentional discrimination.

## C.  Rule 38 Request

Finally, Defendants argue in their brief that Idemudia's discrimination claim is so lacking in factual and legal bases that we should find his appeal "frivolous" and should provide Defendants the opportunity to recover damages and costs pursuant to Federal Rule of Appellate Procedure 38. Because Defendants' request was "not made in a separately filed motion as Rule 38 requires," we deny the request.  *K & T Enters., Inc.*, 97 F.3d 171, 181 (6th Cir. 1996); *accord Anderson v. Williamson*, 100 F.3d 956, 1996 WL 640464, at \*3 (6th Cir. 1996) (unpublished table decision); *Clark v. Cent. Cartage Co.*, 73 F.3d 361, 1995 WL 758459, at \*3 (6th Cir. 1995) (unpublished table decision).  We observe, however, that Idemudia's appeal was not frivolous.

## IV.  CONCLUSION

Because Idemudia has not presented evidence sufficient to raise a genuine issue of material fact as to whether Defendants' reasons for terminating him were pretext for discrimination, we **AFFIRM** the district court's grant of summary judgment in favor of Defendants on all claims.